OPINION OF THE COURT
Anne G. Feldman, J.
Defendant moves pursuant to GPL 440.10 to vacate the judgment of conviction for murder under Crawford v Washington (541 US 36 [2004]) on the grounds that his Sixth Amendment right to confrontation was abridged by the admission of certain hearsay statements in his trial for murder. Specifically, defendant contends: (1) that the statement of the deceased, Nathaniel Burgos, identifying defendant as the perpetrator, made in response to police inquiry, was testimonial in nature and inadmissible, and (2) that absent the medical examiner who had conducted the autopsy and prepared the autopsy report, the trial testimony of another assistant medical examiner and the autopsy report itself were both inadmissible.
This court, having analyzed the testimony at trial and the applicable law, concludes that the hearsay evidence at issue is not subject to the constraints of Crawford.
Facts
Upon hearing gunshots, decedent’s wife, Elizabeth Cruz, testified that she awoke to see Burgos who had been shot twice in the back, lying bleeding on the sidewalk below their second floor apartment. In response to her inquiry he told her “it hurt,” that she should call an ambulance and get him “something to drink, some Pepsi.” As she turned to leave, Burgos repeated that “it hurt” and stated that “I’m dying.” After calling for an ambulance Cruz returned with the soda to find the police had arrived. Burgos attempted to drink the soda but could not and repeated that he was in pain and that he was dying. The police, who were unable to communicate with Burgos because he spoke only Spanish, asked Cruz to serve as interpreter and to inquire who had shot him. Burgos responded that the shooter was the defendant whom he identified by a nickname. Burgos died a few hours later.
*731 This statement was admitted at trial initially as an excited utterance and subsequently characterized as a dying declaration as well. The trial court reasoned that, while Burgos’ initial request for an ambulance and for some soda indicated that he was not expecting to die, at the point he answered the police inquiry his circumstances had changed and he now believed he was facing imminent death. The Appellate Division, Second Department, held that the statement was properly admitted as an excited utterance, thus finding it unnecessary to rule whether it also qualified as a dying declaration (People v Durio, 175 AD2d 842, 844 [1991]).
With regard to the autopsy report, it was admitted at trial as a business record. The testifying pathologist was qualified as an expert witness and testified about the findings delineated in the report and, using the report as a reference, rendered an opinion as to the cause of death.
Legal Analysis
In Crawford the Court held that the testimonial statement of a witness who was unavailable to testify can only be admitted at trial if the defendant had a prior opportunity to cross-examine that witness regardless of whether such statement is deemed reliable by the trial court. By so ruling, the Court explicitly rejected its reasoning in Ohio v Roberts that permitted the use of such testimonial hearsay statements as long as the statement bore “adequate indicia of reliability” by either falling within a “firmly rooted hearsay exception” or containing “particularized guarantees of trustworthiness” (Ohio v Roberts, 448 US 56, 66 [1980] [internal quotation marks omitted]). The Court announced a new rule of constitutional law: “Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.” (Crawford v Washington at 68-69.) “To be sure, the Clause’s ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be rehable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.” (Id. at 61.)
The Court, however, declined to expressly define the term “testimonial,” noting that it left “for another day any effort to spell out a comprehensive definition” {id. at 68). Instead it outlined the contours and context of what it deemed testimonial. “[T]he principal evil at which the Confrontation Clause was *732 directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examination as evidence against the accused” (id. at 50). The English common-law tradition of “live testimony in court subject to adversarial testing” was the preferred alternative to the dreaded “examination in private by judicial officers” (id. at 43).
The central focus of the Court’s concern was a “core class of ‘testimonial’ statements,” the silhouette of which can be sketched from three separate definitions sharing what the Court called “a common nucleus” (id. at 51-52). The first included “ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially” (id. at 51). The second, somewhat repetitively, highlighted “extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions” (id. at 51-52). The third and most expansive definition pointed to “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial” (id. at 52). “Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations” (id. at 68).[1]
The Crawford court also delineated what was not implicated by Sixth Amendment concerns. Hearsay that bore “little resemblance to the civil-law abuses” targeted by the Confrontation Clause is nontestimonial. (Id. at 51.) “Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law — as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.” (Id. at 68.) Examples of nontestimonial hearsay included statements in furtherance of a conspiracy, “off-hand, overheard” remarks, “casual remark[s] to an acquaintance,” and business records (id. at 51) to which Chief Justice Rehnquist, in his concurring opinion, added “official records.” (Id. at 76.)
Finally, the Court limited its core concern as to what is testimonial to those “modern practices with closest kinship to *733 the abuses at which the Confrontation Clause was directed” (id. at 68). “[T]he common-law right of confrontation[ ] thus reflects an especially acute concern with a specific type of out-of-court statement.” (Id. at 51.)
Dying Declarations
In Crawford the Court left unanswered, for the time being, the question of whether dying declarations constitute an exception to its newly articulated constitutional rule. While acknowledging that historically exceptions to the hearsay rule had always existed, there was “scant evidence that exceptions were invoked to admit [hearsay] testimonial statements against the accused in a criminal case.” (Id. at 56.) However, the Court went on to note, “The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed . . . Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are.” (Id. at 56 n 6.) “If this exception must be accepted on historical grounds, it is sui generis.” (Id.)
The Court analyzed the anomaly of dying declarations from a historical perspective, stating the Sixth Amendment “is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding” (id. at 54). Justice Scalia reached back to Mattox v United States (156 US 237, 243 [1895]) which specifically referred to a victim’s dying declaration as an example of hearsay evidence that was admissible despite being contrary to the literal meaning of the Confrontation Clause. The Mattox court noted that many of the provisions in the Bill of Rights were subject to exceptions recognized long before the adoption of the Constitution and that “[s]uch exceptions were obviously intended to be respected.” (Id.)
“[F]rom time immemorial [dying declarations] have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility. They are admitted, not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent any manifest failure of justice.” (Id. at 243-244.)
By citing Mattox, with its reference to the well-settled “rule of necessity,” the Crawford court recognized that a defendant’s *734 right of confrontation is not absolute. Dying declarations are clearly an aberration. Their admissibility must be considered in the context of the overwhelming interest of public policy.
In this instance, the victim of the shooting was in extremis and speaking “under a sense of impending death, with no hope of recovery” (People v Nieves, 67 NY2d 125, 132 [1986]). Thus, as a dying declaration, the statement in this case, although made in response to police questions and therefore considered to be testimonial in nature, was properly admitted at trial.
Autopsy Report
Under Crawford business records are specifically exempted from challenge because they are outside the “core testimonial statements that the Confrontation Clause plainly meant to exclude” (Crawford at 63). Justice Scalia stated that business records are not testimonial “by their nature” (id. at 56). While Crawford provides no definition of the term “business record,” either constitutionally or historically, its use of the phrase “by their nature” leads to the conclusion that the Court was speaking of the present day business record exception as codified in Federal Rules of Evidence rule 803 (6).[2] The essence of the business record hearsay exception contemplated in Crawford is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are “by their nature” not prepared for litigation.
The rationale for the business record exception is grounded in both necessity and enhanced reliability (see 2 McCormick, Evidence § 286, at 250 [5th ed 1999]). The exception recognizes that each participant’s independent recollection of routine, repetitive activities would be minimal. Reliability is reinforced by systemic regularity and precision and the business’ reliance on the continuing duty of an individual to make an accurate *735 record (see Advisory Committee Notes, reprinted following Fed Rules Evid rule 803 [6]).
Under New York law an autopsy report can be considered a business record pursuant to CPLR 4518. (See Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C4520:l, at 242.)[3] The rationale for its admission is equivalent to that of the comparable federal rule. “[R]ecords systematically made for the conduct of a business as a business are inherently highly trustworthy because they are routine reflections of day-to-day operations and because the entrant’s obligation is to have them truthful and accurate for purposes of the conduct of the enterprise.” (People v Kennedy, 68 NY2d 569, 579 [1986].)
A public agency such as the Office of the Chief Medical Examiner (OCME) constitutes a “business” for the purposes of CPLR 4518 (see People v Guidice, 83 NY2d 630, 635 [1994]; People v Foster, 27 NY2d 47, 52 [1970]). In Foster the Court of Appeals determined a police department to be a “business” and found admissible speedometer deviation records under the business record exception because they were prepared in the ordinary course of police business. In language apposite to autopsy reports, the Court stated that “[w]hile it is true that such records may later be used in litigation, such was not the sole purpose when they were made, and, therefore, they should not be excluded merely because this was a possible future use.” (People v Foster at 52.)
In People v Nisonoff (293 NY 597, 602 [1944], cert denied 326 US 745 [1945]), the Court held admissible the factual findings contained in the report authored by an assistant medical examiner who had died prior to trial because the report was an “official record . . . required to be kept” (also see People v Sanders, 56 NY2d 51, 63 [1982]). It permitted the chief medical examiner to testify as an expert and render his opinion as to the cause of death based on the findings delineated in the report.
The OCME is not a law enforcement agency and is “by law, independent of and not subject to the control of the office of the *736 prosecutor.” (People v Washington, 86 NY2d 189, 192 [1995].) OCME “is required simply to investigate unnatural deaths” (United States v Rosa, 11 F3d 315, 332 [2d Cir 1993]) and is required to perform autopsies in a number of situations only one of which is when the death is potentially the product of a homicidal act (People v Washington at 192). Article 42, title II of the Public Health Law sets requirements for the performance of autopsies and minimal standards for those who perform them. Pursuant to chapter 22, § 557 (g) of the New York City Charter, OCME must keep “full and complete records in such form as may be provided by law” and shall deliver such records to the prosecutorial authorities when there is “in the judgment of the medical examiner in charge, any indication of criminality.”
OCME is not authorized to gather evidence or determine the identity of a particular perpetrator and is not responsible for enforcing any criminal laws (United States v Rosa at 332). OC-ME’s independence distinguishes its autopsy reports from the blood test report held to be testimonial in People v Rogers (8 AD3d 888, 891 [3d Dept 2004]). In Rogers the report was rejected as a business record “[b]ecause the test was initiated by. the prosecution and generated by the desire to discover evidence against defendant.”
The autopsy report in this case was not manufactured for the benefit of the prosecution. Indeed, an autopsy is often conducted before a suspect is identified or even before a homicide is suspected. That it may be presented as evidence in a homicide trial does not mean that it was composed for that accusatory purpose or that its use by a prosecutor is the inevitable consequence of its composition. “The mandate to OCME is clear, to provide an impartial determination of the cause of death.” (People v Washington at 193.)
Finally, courts cannot ignore the practical implications that would follow from treating autopsy reports as inadmissible testimonial hearsay in a homicide case. Years may pass between the performance of the autopsy and the apprehension of the perpetrator. This passage of time can easily lead to the unavailability of the examiner who prepared the autopsy report. Moreover, medical examiners who regularly perform hundreds of autopsies are unlikely to have any independent recollection of the autopsy at issue in a particular case and in testifying invariably rely entirely on the autopsy report. Unlike other forensic tests, an autopsy cannot be replicated by another pathologist. Certainly it would be against society’s interests to permit the *737 unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case.
Thus, the admission of the routine findings recited in the autopsy report were not testimonial and the accompanying testimony of an assistant medical examiner who had not authored the report explaining and expostulating on the findings was proper.
Accordingly, defendant’s motion is denied.
[Portions of opinion omitted for purposes of publication.]

. The Court noted that it used the term “interrogation” in its “colloquial, rather than any technical, legal sense” (id. at 53 n 4).

. Federal Rules of Evidence rule 803 (6) provides in pertinent part: “The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness: A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term ‘business’ as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.”

. CPLR 4518 (a) defines a business record as “[a]ny writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event” and provides that it “shall be admissible in evidence in proof of that act, transaction, occurrence or event, if the judge finds that it was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter.”