FIFTH DIVISION
November 12, 2010

No. 1-07-1448

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 13211 |
| | ) | |
| CURTIS LEACH, | ) | The Honorable |
| | ) | Thomas P. Panichi, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TOOMIN delivered the opinion of the court:

In this appeal, we determine whether defendant's confrontation rights were abridged by the admission of autopsy findings of a forensic pathologist who did not testify at defendant's trial. Following a bench trial, defendant Curtis Leach was convicted of first degree murder of his wife and sentenced to 28 years' imprisonment. Defendant appeals, contending that the court erred by: (1) admitting opinion evidence based upon testimonial hearsay contained in the autopsy findings of a retired pathologist in violation of *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004); and (2) finding him guilty of first degree murder, rather than a lesser grade of homicide, where the evidence failed to establish beyond a reasonable doubt that he knew his acts created a strong probability of death or great bodily harm.

In *People v. Leach*, 391 Ill. App. 3d 161, 908 N.E.2d 120 (2009), we affirmed defendant's conviction. On September 29, 2010, pursuant to its supervisory authority, the Illinois Supreme Court directed this court to vacate our judgment in *Leach*, 391 Ill. App. 3d 161, 908 N.E.2d 120, and to consider whether, in light of the holding of *People v. Williams*, No. 107750

No. 1-07-1448

(July 15, 2010), a different result is warranted. We conclude it does not and for the following reasons affirm the judgment of the circuit court.

BACKGROUND

Defendant's conviction stemmed from the strangulation of his wife, 29-year-old Latyonia Cook-Leach on June 30, 2004. The evidence inculpating defendant was essentially based on his videotaped confession, corroborated by opinion evidence as to cause and manner of death, and coupled with the results of the crime scene investigation.

The trial evidence disclosed that on the afternoon of June 30, 2004, defendant walked into the Harvey police department and reported he had choked his wife to death in Robbins several hours earlier. In turn, he was later transported to the Robbins police department. The next day, at 3 p.m., defendant gave a videotaped confession to Assistant State's Attorney Terrence Reilly, witnessed by Robbins Detective Dion Kimple, and admitted at trial with its accompanying 65-page transcription. Although the salient recitals of defendant's statement acknowledge that he performed the acts which caused the death of Latyonia, the mental state accompanying his conduct was strongly disputed at trial.

Defendant related that for the past two years he lived at 13795 Grace Street in Robbins with Latyonia and their three children, Emanuel, age 11, Sakiyo, age 7, and Sakera, age 6. Defendant was 30 years old. He had left Thornton High School in 1993, after his sophomore year, and supported himself and later his family, doing temporary work and odd jobs. He was presently working at a recycling factory in University Park, where his work schedule for the week was 3 p.m. to 2 a.m.

2

On June 30, 2004, defendant arrived home at 2:30 a.m. He removed his work shoes and, after eating in the kitchen and smoking several cigarettes, he then went upstairs to bed. The townhouse had three bedrooms and a bathroom that adjoined an upstairs hallway. The first bedroom was occupied by his son and the second by his daughters. Defendant and Latyonia slept in the last bedroom at the end of the hallway. After checking on the children and noting that they were asleep, defendant entered his bedroom and turned on the lights. Latyonia was in their bed, which was pushed up against the window. She slept in the nude, and after turning to acknowledge his presence, she immediately got up and put on a nightgown. Defendant lay down on the side of the bed nearest the door and smoked another cigarette. Latyonia lay down on the opposite side of the bed closest to the window.

According to defendant, Latyonia had an "attitude." She was angry at the way he had been treating her, that he did not give her enough space to do the things she wanted to do. Defendant listened, but he just wanted to go to sleep. Latyonia complained that she was tired of being broke, living week to week, and being unable to pay the bills on time. Her voice was raised in an angry and shouting manner. She continued berating him for about two hours talking about getting out of the projects, out of Robbins and getting a house. She went on and on and would not let him respond or go to sleep.

At some point Latyonia was sitting on the bed, "Indian style," with her legs folded under her and her back to the window. She was smoking a cigarette, and as she reached over him to use the ashtray, she "intentionally" put the cigarette on defendant's hand. Latyonia then said, "Excuse me, I didn't mean to do that," and then she laughed. Defendant showed the spot on his hand to

the prosecutor.

Latyonia continued arguing and defendant kept telling her things would be better, that he would change. They should just go to sleep and pick up on it the next day. But the argument instead went to the next level with Latyonia first accusing defendant of thinking she was cheating on him and then suggesting that he was "already probably doing stuff himself." When defendant reached out to calm Latyonia down, "she didn't want me to touch her so she pushed my hand up off her." According to defendant, Latyonia then "got to pushing me" and he "pushed her back." They got "into an altercation where we was wrestling" and Latyonia then began to hit defendant in his face, first with an open hand and then with her fist. He tried to contain Latyonia by grabbing her hands, but she was stronger and "had so much anger she broke loose." They continued wrestling on the bed until defendant managed to push Latyonia down on the bed and restrain her as she lay on her back.

Defendant admitted that "a good three minutes after *** I was choking her *** she just stopped moving.' Defendant then stated:

"[S]he couldn't *** actually cry out and holler because I was *** trying to *** restrain her. But all the pushing and moving and stuff it just exceeded me to do it hard. So after I'd say two minutes of just -- no, around a good minute and good 15 seconds of straight force up around her neck, she was moving and stuff and then she just stopped moving. So after that, after she stopped moving, I kind of got up and she wasn't moving. So I was in shock because I was like, well, she might have passed out, she might have passed out. So I checked her *** pulse. *** She didn't have no

4

pulse."

Defendant then put a pillow under Latyonia's head, lifted her head and attempted to resuscitate her by holding her nose and breathing into her mouth. After five minutes, he discerned no response and just sat on the bed for another five minutes. Defendant did not call 911 to request an ambulance. Believing there was no way of reviving Latyonia, he left the bedroom after putting a cover over her.

Defendant recalled it was then 6:25 or 6:30 a.m., time to wake up the children for summer school. After they were dressed he told them that their mother was asleep in the bedroom and he would be driving them to school. Actually, he was taking the children to Latyonia's mother's house in Hazel Crest, which is right behind the school they attended. They left the house around 7:25 a.m. and he took Latyonia's cell phone as well as her mother's keys to let the children into the house. Although defendant entered with the children, nobody was awake and he left them to watch television until school began.

Defendant then returned to his house. When he looked into the bedroom he saw that Latyonia was "still in the same position that he had left her in." He left with the intention of going to his mother's house in University Park, but enroute called his sister Tiffany Leach. Although he told Tiffany about his fight with his wife, in response to her inquiry he expressly denied he had killed Latyonia. Upon arrival at his mother's home, defendant was crying and initially admitted, "I killed her." But then he lied and said, "No, I didn't, we was just fighting." Defendant explained that his mother had health issues of her own and his intention was to calm her down. He left, telling the family he was going to McDonald's to get something to eat.

5

In turn, defendant drove to a lake in University Park where he contemplated taking his own life. Instead of jumping into the water, defendant called another sister, Sharon, and told her Latyonia was dead and he was "fitting to die too." Sharon convinced him that God would forgive him for what he had done to Latyonia, but would not forgive him if he killed himself. Defendant then left the lake and returned to his car.

While driving, defendant's brother-in-law, Napolean Fisher, called on Latyonia's cell phone. After telling Fisher that he had "messed up real bad," defendant was advised to stop running and turn himself in. Later, they met at a local gas station, after which Fisher took defendant to the Harvey police department, where he surrendered into custody. Upon being informed of his *Miranda* rights, defendant told the same story to the police that he later recounted to Assistant State's Attorney Reilly. Several hours later, defendant was taken to the Robbins police department, where he repeated the story to the police.

That evening, while being housed at the Robbins jail, defendant attempted to commit suicide. He told the State's Attorney that he kept seeing Latyonia, who told him that both she and God would forgive him for what he had done to her. He did not want to live without her. Defendant then removed his pants and hung himself from the cell bars until he passed out. When defendant awoke, he was on the ground.

Sandra Cook, defendant's mother-in-law, testified and confirmed that on the morning of June 30, 2004, defendant dropped the children off at her house. Later that morning, Mrs. Cook received an alarming telephone call from defendant's mother, Mary Leach, which caused her to call the Robbins police department to request a wellness check on Latyonia. Additionally,

6

although Mrs. Cook acknowledged that Latyonia was an "on again, off again smoker," she denied that her daughter was smoking at the time of her death.

Robbins police officer Reginald Harris testified that at 10:53 a.m. he was assigned to do the wellness check on Latyonia. On arrival, he found the front door was locked, but he was able to gain entry with the help of an on-site manager for the project. Officer Harris found Latyonia in an upstairs bedroom, lying mostly covered in a bed. Determining she was unresponsive, Harris called for an ambulance. Upon arrival of the medical team, he escorted the officers to the bedroom and Latyonia was pronounced dead at about 11:40 a.m. Officer Harris further testified he saw no signs of any disturbance or fight. Nothing was knocked over or broken.

Evidence technician Lilliebridge processed the scene with her partner. She observed some blood on the pillow beneath Latyonia's head as well as on the bedding underneath her hand. The bedroom was pretty neat; nothing looked out of place or thrown about. Additionally, the bed had a wooden headboard containing toiletry items which "were upright and undisturbed." After processing the scene, Officer Lilliebridge later photographed defendant at the Robbins police department. Defendant had a cut on one of his fingers and a "discoloration with raised skin" on his right hand. The officer observed no bruising on his body.

The State's final witness, Dr. Valarie Arangelovich, a Cook County deputy medical examiner, presented expert testimony in the field of forensic pathology. Latyonia's autopsy was actually performed by Dr. Eupil Choi, who had retired in 2004. In turn, Dr. Arangelovich was assigned the case and provided the autopsy protocol, the toxicology report, the body diagram, the investigator's report and photographs. The doctor relied on these materials to form her opinion

as to cause and manner of death.

Dr. Arangelovich described what Dr. Choi observed and recorded in the protocol. His external examination revealed that Latyonia was clothed in a house shirt and underwear, and her body was accompanied by an elastic bandage. Latyonia was 5 feet 9½ inches tall and weighed 295 pounds. Her right eye had "multiple petechiae hemorrhages on the upper scleral" and "diffuse scleral hemorrhages" on the lower portions; her left eye also had "diffuse hemorrhage" on the lower portions. A foamy fluid has escaped from Latyonia's nostrils and there were bluish marks on both sides of her neck. There were no wounds to Latyonia's face or upper extremities of her body. Some blood was observed on her mouth, but no other external signs of trauma.

Dr. Arangelovich also related the results of Dr. Choi's internal examination. No injuries were noted to the neck organs, other than the trachea, where a little bit of blood tinged foamy fluid was observed. The lining of the trachea also displayed a reddish discoloration.

Based upon her review of Dr. Choi's autopsy materials, Dr. Arangelovich concurred in his opinion that the cause of death was strangulation and the manner of death was homicide. If she had not agreed with Choi, she would have so testified. However, she could not determine whether Latyonia was strangled manually or with a ligature. Dr. Arangelovich testified that her findings were confirmed by injuries depicted on the autopsy photographs she identified, some of which were not noted by Choi:

"[F]irst looking at the neck, there are marks on the neck which show that there was some trauma to the neck area. And then when you look in the trachea, there is some bloody tinged fluid, which those two findings as well as what was in her eyes, she had hemorrhages in both

8

eyes. It means that there was some pressure placed on her neck which stopped her blood flow from going in and out of the brain. And because of this blockage in the blood going in and out, the blood vessels in her eyes burst because of that pressure, and that pressure also because it's stopping let's say nutrient filled blood from getting to the brain, the brain shuts down and the brain is the master switch."

According to the doctor, once the flow of blood to the brain is stifled or stopped a person can lose consciousness within anywhere from 10 to 30 seconds. After becoming unconscious, if pressure is removed, a person could potentially revive, depending on the physical state of her heart and other organs. It takes three to six minutes of pressure for there to be irreversible brain damage or death.

Following presentation of the State's case, the defense moved for a finding of not guilty asserting that the evidence failed to establish that Curtis Leach was guilty of first degree murder. At best, the defense argued, that State had proved defendant guilty of involuntary manslaughter, based upon defendant's recklessness, or second degree murder in the heat of intense passion while engaged in mutual combat with Latyonia, who was the aggressor and outweighed the defendant by 100 pounds. On denial of the motion, the defense rested.

The trial judge found defendant not guilty of count I, intentional murder, but guilty of count II, knowing murder. The court reasoned:

"[T]he evidence is clear that the length of time that it had to be for the choking, that you knew that such strangling with your hand created a strong probability of death or great bodily harm.

9

I don't know if it is fifteen seconds or three minutes or six minutes.

I re-listened to your statement and an accident happens with a gun, an accident happens with a knife, an accident happens with a car, an accident happens with a lot of things like that.

I don't see how an accident can happen with your hands.***

* * *

Man or woman, I don't think that mattered to me ***

I think that another man, even a hundred pounds larger, I don't believe it was mutual combat here, I don't think there is enough here for that at all.

* * *

But beyond a reasonable doubt, I think that you committed the crime of first degree murder."

## ANALYSIS

### Opinion Testimony Based on Dr. Choi's Autopsy Findings

Prior to trial, the defense moved *in limine* to bar the State from calling any forensic pathologist, apart from Dr. Choi, to testify concerning Latyonia's postmortem examination as recorded in the autopsy protocol. The trial court denied the motion and overruled defense counsel's renewed objections to the evidence at trial as well as in defendant's posttrial motion. Hence, the claim of error was properly preserved for our consideration.

The defense contended then, as now, that the trial court's ruling allowing Dr. Arangelovich to testify in Dr. Choi's stead as to his earlier observations and findings denied

10

defendant his confrontation rights mandated by *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). In defense of the trial court's ruling, the State submits that the results of Dr. Choi's autopsy were properly admitted under the business record exception to hearsay (725 ILCS 5/115-5.1 (West 2002)), and in any event, the assertions made in the protocol were not offered to prove the truth thereof but, rather, as a basis for Dr. Arangelovich's expert opinion.

Before addressing the merits of the issue, we must determine the appropriate standard of review. Generally, a trial court's *in limine* rulings concerning the admission of evidence are reviewed under an abuse of discretion standard. *People v. Hansen*, 327 Ill. App. 3d 1012, 1015, 765 N.E.2d 1033, 1037 (2002). However, where, as here, the admissibility turns upon a question of law, *de novo* review is appropriate. *People v. Hall*, 195 Ill. 2d 1, 21, 743 N.E.2d 126, 138 (2000). See *People v. Sutton*, 375 Ill. App. 3d 889, 897, 874 N.E.2d 212, 219 (2007) (*Crawford* constitutional error is reviewed under *de novo* standard).

The fundamental guarantee of the sixth amendment provides that "in all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. In *Crawford*, the United States Supreme Court held that where testimonial evidence is at issue, this bedrock principle "demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Although the *Crawford* Court distinguished between testimonial and nontestimonial hearsay, it did not articulate a comprehensive definition of what it perceived to be testimonial. However, the Court did caution that "[w]hatever else the term

11

covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Conversely, where nontestimonial hearsay is at issue, the Court held that "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law *** as would an approach that exempted such statements from Confrontation Clause scrutiny." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Included within that class of hearsay exemptions were business records and statements in furtherance of a conspiracy which the Court acknowledged as historically nontestimonial. *Crawford*, 541 U.S. at 56, 158 L. Ed. 2d at 195-96, 124 S. Ct. at 1367.

Given *Crawford*'s exclusion of business records from the scrutiny of the confrontation clause, we question whether the holding is truly implicated by the present inquiry. An unbroken line of precedent instructs that business records have been uniformly regarded as an exception to the hearsay rule. *Chicago & Alton R.R. Co. v. American Strawboard Co.*, 190 Ill. 268, 270-71, 60 N.E. 518, 519-20 (1901); *People v. Tsombanidis*, 235 Ill. App. 3d 823, 835, 601 N.E.2d 1124, 1132 (1992). Recognized at common law as the "shop record rule," its codification was premised on the concept of routineness. *People v. Mormon*, 97 Ill. App. 3d 556, 564-65, 422 N.E.2d 1065, 1075 (1981). Section 115-5(a) of the Code of Criminal Procedure of 1963 thus provides:

> "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event,

12

if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or marker, may be shown to affect its weight, but such circumstances shall not affect its admissibility." 725 ILCS 5/115-5(a) (West 2002).

The rationale underlying the admissibility of business records is the recognition that businesses are motivated to keep routinely accurate records and that they are unlikely to falsify records kept in the ordinary course of business and upon which they depend. *People v. Morrow*, 256 Ill. App. 3d 392, 397, 628 N.E.2d 550, 554 (1993). Hence, the credibility of such records is founded on "the regular, prompt, and systematic nature of the entry and the fact that it is relied on in the operation of the business." *Tsombanidis*, 235 Ill. App. 3d at 835, 601 N.E.2d at 1132.

Embraced within the rubric of nontestimonial hearsay is the public records exception, records required by statute or authorized to be maintained by the nature of the office, evidencing matters properly required to be maintained and recorded. *People v. Hester*, 88 Ill. App. 3d 391, 395, 410 N.E.2d 638, 640 (1980). Like business records, the exception is based on the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.12 (8th ed. 2004). Records of the medical examiner are a species of "public documents," generally admissible at common law even

No. 1-07-1448

in the absence of statutory authority. *Steward v. Crissell*, 289 Ill. App. 3d 66, 69, 681 N.E.2d 1040, 1042 (1997). Moreover, autopsy reports are clearly recognized under the codification of the common law exception. Section 115-5.1 of the Code of Criminal Procedure of 1963 provides:

"In any civil or criminal action the records of the coroner's medical or laboratory examiner summarizing and detailing the performance of his or her official duties in performing medical examinations upon deceased persons or autopsies, or both, and kept in the ordinary course of business of the coroner's office, duly certified by the county coroner or chief supervisory coroner's pathologist or medical examiner, shall be received as competent evidence in any court of this State, to the extent permitted by this Section. These reports, specifically including but not limited to the pathologist's protocol, autopsy reports and toxicological reports, shall be public documents and thereby may be admissible as prima facie evidence of the facts, findings, opinions, diagnoses and conditions stated therein.

A duly certified coroner's protocol or autopsy report, or both, complying with the requirements of this Section may be duly admitted into evidence as an exception to the hearsay rule as prima facie proof of the cause of death of the person to whom it relates. The records referred to in this Section shall be limited to the records of the results of post-mortem examinations of the findings of autopsy and toxicological laboratory examinations." 725 ILCS 5/115-5.1 (West 2002).

Well prior to *Crawford*, Illinois courts relied upon the foregoing statute to permit

14

presentation of the autopsy findings of a nontestifying medical examiner. *People v. Harper*, 279 Ill. App. 3d 801, 812-13, 665 N.E.2d 474, 484 (1996). Because of section 115-5.1, the bar of hearsay does not apply. *Harper*, 279 Ill. App. 3d at 813, 665 N.E.2d at 484. That result continues to endure, well into the post-*Crawford* setting. *People v. Moore*, 378 Ill. App. 3d 41, 50, 880 N.E.2d 229, 237 (2007) ("A plain reading of the statute governing the admissibility of the medical examiner's report as evidence leads us to conclude that an autopsy report should be treated as a business record").

We further observe that an identical result has obtained in the majority of other forums addressing this issue: (1) *United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006) (autopsy reports qualify as public records under Federal Rule Evidence 803(8) as they are records setting forth activities of the office or matters observed pursuant to duty imposed by law as to which matters there was a duty to report); (2) *State v. Craig*, 110 Ohio St. 3d 306, 2006 Ohio 4571, 853 N.E.2d 621 (we agree with the majority view under *Crawford* and conclude that autopsy records are admissible as nontestimonial business records); (3) *State v. Cutro*, 365 S.C. 366, 618 S.E.2d 890 (2005) (autopsy reports are not testimonial and therefore do not implicate the confrontation clause); and (4) *Campos v. State*, 256 S.W.3d 757 (Tex. App. 2008) (an autopsy report contains a sterile recitation of fact and is nontestimonial within the meaning of *Crawford*).

Even in those minority jurisdictions holding that autopsy reports do qualify as testimonial under *Crawford*, those courts nonetheless have determined that admission of such evidence was harmless beyond a reasonable doubt. See *Smith v. State*, 898 So. 2d 907 (Ala. Crim. App. 2004); *State v. Davidson*, 242 S.W.3d 409 (Mo. App. 2007).

15

No. 1-07-1448

We are of course mindful of defendant's argument that the out-of-court assertions of Dr. Choi were indeed testimonial. The defense posits that, inasmuch it is the duty of the medical examiner to work hand-in-hand with law enforcement authorities, the medical examiner is part and parcel of the prosecutorial function. Citing to the Counties Code, defendant argues that medical examiners, as much as coroners, still function as adjuncts to the police and the prosecutor in performing and recording autopsies for purposes of investigating crimes, in anticipation of use in future prosecutions. 55 ILCS 5/3-3013 (West 2006). We find defendant's reliance on the Counties Code unpersuasive, especially so because the office of coroner of Cook County was eliminated in 1976, with the office of the medical examiner created in its stead. See Ordinances & Resolutions of the County of Cook Medical Examiner §§5-120-1, 5-121-2 (eff. July 27, 1976). The Counties Code now requires that the medical examiner investigate any deaths that fall within 15 enumerated categories, including, *inter alia*, criminal violence, suicide, accident, disease constituting a threat to public, deaths during medical diagnosis or therapeutic procedure, suspicious and unusual circumstances, as well as other suspected causes. See Ordinances & Resolutions of the County of Cook Medical Examiner §5-128-9 (eff. July 27, 1976). Although the medical examiner in such cases is mandated to conduct an investigation, including an autopsy if necessary, we do not perceive a law enforcement function, but rather an examination sufficient to establish manner and cause of death. Ordinances & Resolutions of the County of Cook Medical Examiner §5-129-11 (eff. July 27, 1976).

Defendant further maintains that in *Sims-Hearn v. Office of the Medical Examiner*, 359 Ill. App. 3d 439, 834 N.E.2d 505 (2005), we described the medical examiner's function in

16

performing autopsies to be analogous to that of a police officer investigating a suspected homicide, as both investigated deaths. *Sims-Hearn*, however, involved a *pro se* action wherein the plaintiff alleged that the medical examiner negligently determined that her son's death was not the result of a violent crime but, rather a drug overdose. The complaint was dismissed on a finding that medical examiners owe no duty of care to members of the public while performing their customary duties. *Sims-Hearn*, 359 Ill. App. 3d at 445, 834 N.E.2d at 511. However, the holding did not remotely concern the nontestimonial nature of autopsy findings; the language relied upon by defendant abjectly is taken out of context and is simply *dicta*.

We find more instructive the New York holding in *People v. Durio*, 7 Misc. 3d 729, 794 N.Y.S.2d 863 (Sup. Ct. 2005), where the court acknowledged that while an autopsy report may indeed be used in a homicide prosecution, it is not composed for that accusatory purpose. As in Illinois, the New York medical examiner is not a law enforcement agency. Rather, that officer is simply empowered to investigate unnatural deaths and is authorized to perform autopsies in a number of situations, only one of which is when death is potentially the product of a homicidal act. *Durio*, 7 Misc. 3d at 735, 794 N.Y.S.2d at 868. As here, the medical examiner does not determine the identity of a particular perpetrator; indeed, an autopsy is often conducted before a suspect is identified or even before a homicide is suspected. *Durio*, 7 Misc. 3d at 736, 794 N.Y.S.2d at 868. Under *Durio*'s rationale, we reject the assertion that autopsy reports are manufactured for the benefit of the prosecution and are thereby testimonial. Consequently, we find that the autopsy protocol in the case *sub judice* did not implicate *Crawford*. Defendant was not by reason of its use denied his valued right of confrontation.

17

No. 1-07-1448

Even assuming, *arguendo*, that Dr. Choi's observations and findings were truly testimonial, our appraisal of defendant's claim of error would remain unchanged. Under *Crawford*, the confrontation clause bars the use of testimonial statements where offered to prove the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9. Conversely, where testimonial statements are offered for some other purpose, *Crawford* has no application. See *People v. Williams*, 385 Ill. App. 3d 359, 368-69, 895 N.E.2d 961, 969 (2008).

The hearsay rule traditionally prohibits the admission of out-of-court statements where offered as an assertion to show the truth of the matter asserted therein, thus resting for its value upon the credibility of the out-of-court asserter. *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963). See also C. McCormick, Handbook of Evidence §225 (1954). The rule is not implicated, however, where statements otherwise inadmissible as hearsay are used by experts for the purpose of explaining the bases for their opinions. *People v. Jones*, 374 Ill. App. 3d 566, 579-80, 871 N.E.2d 823, 834-35 (2007).

In *Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981), our supreme court adopted the standard for the use of expert opinion testimony at trial contained in Federal Rules of Evidence 703 and 705. Under Rule 703, an expert may base his or her opinion upon facts that are not in evidence if those facts are of a type reasonably relied upon by experts in the particular field. *Wilson*, 84 Ill. 2d at 193, 417 N.E.2d at 1326. While the contents of reports and records relied upon by experts may be disclosed, an expert may also testify as to nontestifying experts' findings and conclusions. *People v. Pasch*, 152 Ill. 2d 133, 176, 604 N.E.2d 294, 311 (1992). See also

18

*Jones*, 374 Ill. App. 3d at 579-80, 871 N.E.2d at 834-35. The advent of Rule 703 did not, however, create an exception to the hearsay rule as the underlying facts or data relied upon by the expert are not admitted for their truth. *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185, 554 N.E.2d 1381, 1388 (1990). Rather, they are admitted "for the limited purpose of explaining the basis for the expert witness' opinion." *People v. Anderson*, 113 Ill. 2d 1, 12, 495 N.E.2d 485, 489 (1986).

In the proceedings below, the court proceeded in conformity with Rule 703 and properly allowed Dr. Arangelovich to testify concerning Dr. Choi's observations and findings, as well as his opinion. Actually, Dr. Arangelovich's testimony was broader in that she offered additional and independent observations as to the force necessary for strangulation as well as the time required to cause loss of consciousness and ultimately brain death.

In *People v. Nieves*, 193 Ill. 2d 513, 739 N.E.2d 1277 (2000), as here, the chief medical examiner offered opinion testimony based upon the findings of a since retired pathologist. We find noteworthy the observations of our supreme court:

"In the instant case, Dr. Donoghue reviewed and formed his opinion based upon the contents of Dr. Kirschner's medical file *** which included autopsy photographs, a postmortem examination report, a toxicologic analysis report, an evidence receipt, diagrams made by Dr. Kirschner while he conducted the autopsy, an investigator's report, and other administrative documents. We believe the reports found in Dr. Kirschner's file, which Dr. Donoghue used in forming his opinion, are the type of evidence reasonably relied upon by experts in the field of forensic pathology to form

19

their opinions as to the cause and manner of death." *Nieves*, 196 Ill. 2d at 528, 739 N.E.2d at 1284.

Applying similar reasoning, the supreme court reached the same conclusion in *People v. Williams*, No. 107550 (July 15, 2010), where it rejected the defendant's claim that his sixth amendment rights were violated by the testimony of a forensic analyst who relied upon a DNA report prepared by a private laboratory. The supreme court observed, "it is well established that an expert may testify about the findings and conclusions of a nontestifying expert that he used in forming his opinions." *Williams*, slip op. at 13, citing *People v. Lovejoy*, 235 Ill. 2d 97, 143, 919 N.E.2d 843, 868 (2009). In turn, the court concluded the expert's testimony was not offered for the truth of the matter asserted, but was offered to demonstrate what was relied upon in forming the ultimate opinions. Notably, the court explained that the evidence complained of concerned the testimony and opinion of the expert, rather than the report itself. *Williams*, slip op. at 14-15. Moreover, the expert brought to bear her "expertise, judgment, and skill" to interpret the DNA results, as well an independent statistical analysis of the results. In *Williams*, as in the case *sub judice*, the expert did not "simply read *** from Cellmark's report." *Williams*, slip op. at 18. The court concluded the expert's testimony was not hearsay, as it was not offered for the truth of the matter asserted. Instead, "[The expert] disclosed the underlying facts from Cellmark's report for the limited purpose of explaining the basis for her opinion on the critical issue concerning whether there was a DNA match between the defendant's blood sample and the semen sample recovered from [the victim]." *Williams*, slip op. at 18-19. Permitting the testimony for this purpose "undoubtedly aided" the judge to assess the value of the expert's opinion. *Williams*, slip

No. 1-07-1448

op. at 19.

Because the data compiled by Dr. Choi was not admitted for the purpose of proving the truth of his findings at trial, we perceive no *Crawford* error here. Consistent with *Williams*, the contents of Dr. Choi's report were used to provide a basis for and explain Dr. Arangelovich's ultimate conclusion. As in *Williams*, the witness brought to bear her "expertise, judgment, and skill" to interpret the autopsy protocol and postmortem photographs. That Dr. Arangelovich's testimony confirmed Dr. Choi's conclusion as to the cause and manner of death does not alter the nature of the testimony. Those findings were equally contributing elements of Dr. Arangelovich's opinions and "undoubtedly aided" the trial judge in assessing this aspect of the State's case. We perceive no error from the admission of this opinion evidence.

Sufficiency of the Evidence

Additionally, defendant maintains that the evidence adduced at trial was insufficient to prove him guilty of first degree murder beyond a reasonable doubt. Defendant asserts that the evidence at best proved only the lesser offense of involuntary manslaughter in that he only acted recklessly in choking Latyonia. Alternatively, defendant argues that the evidence proved only second degree murder, as he acted under a sudden, intense passion resulting from severe provocation.

A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that a reasonable doubt of the guilt of the defendant remains. *People v. Smith*, 177 Ill. 2d 53, 73 685 N.E.2d 880, 888 (1997). Upon a challenge to the sufficiency of the evidence of a defendant's guilt, it is not the function of a reviewing court to retry the defendant.

21

*People v. Evans*, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004). The standard for reviewing the sufficiency of the evidence in a bench trial is the same as in a jury trial. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77 (1985). The guidepost governing whether the conviction may be sustained depends on "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979). Thus, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

A person is guilty of the offense of first degree murder when he kills an individual without lawful justification if, in performing the acts which cause the death he intends to kill or do great bodily harm or knows that his acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2002). Conversely, a person commits involuntary manslaughter if he unintentionally kills an individual without lawful justification if his acts, whether lawful or unlawful, are likely to cause death or great bodily harm and he performs them recklessly. 720 ILCS 5/9-3 (West 2002). As noted, in the case *sub judice* the defendant was convicted of count II, knowing murder, and acquitted of count I, intentional murder.

The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death. *People v. DiVincenzo*, 183 Ill. 2d 239, 249, 700 N.E.2d 981, 987 (1998). The state of mind for murder is knowledge, while the *mens rea* for involuntary manslaughter is recklessness. *People v. Givens*, 364 Ill. App.

22

3d 37, 44, 846 N.E.2d 951, 957 (2005). A person is said to have knowledge when he is consciously aware that his conduct is practically certain to cause a particular result. 720 ILCS 5/4-5(b) (West 2002). Alternatively, "[a] person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2002). Reckless conduct generally involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm. *People v. Davis*, 35 Ill. 2d 55, 60, 219 N.E.2d 468, 471 (1966). "Whether the defendant is guilty of murder because his acts created a 'strong probability' of death or great bodily harm or whether he is guilty of involuntary manslaughter because his acts create a 'substantial and unjustifiable risk' of such results is a question for the trier of fact." *People v. Bartall*, 98 Ill. 2d 294, 307, 456 N.E.2d 59, 65 (1983).

In the instant case, the defense candidly acknowledged that the defendant performed the acts which caused the death of Latyonia. Notably, in the course of defendant's court-reported confession, he admitted that although he had fatally choked his wife, he did not mean to kill her; her death was an accident. The issue at trial was thus refined to an assessment of the mental state accompanying defendant's acts.

In rejecting the claim of "accident" the trial court reasoned that while accidents happen with guns, knives, or automobiles it was incomprehensible that the act of strangling a person with one's own hands could fall within the rubric of an accident. As the judge noted:

"[A]n accident happens with a lot of things like that.

I don't see how an accident can happen with your hands."

The court's finding likewise reflect a rejection of the argument that defendant's acts were simply performed recklessly. Rather, the court concluded:

"[T]he evidence is clear that the length of time that it had to be for the choking that you knew that such strangling with your hand created a strong probability of death or great bodily harm."

The trial court's rejection of mere recklessness finds support in the testimony of the medical examiner as well as the defendant. Dr. Arangelovich found objective manifestations of strangulation from trauma to Latyonia's neck, bloody tinged fluid in her trachea and hemorrhages in both eyes. Pressure applied to Latyonia's neck caused the blood vessels in her eyes to burst and her brain to shut down. According to Dr. Arangelovich, a person loses consciousness and control over their limbs after 10 to 30 seconds of choking. Death results between three to six minutes of continued pressure. Because defendant estimated that he choked Latyonia for three minutes, the trial judge could well conclude that defendant must have choked his wife for a minimum of 2 minutes and 30 seconds after she lost consciousness. Given that time frame, the court could reasonably find that defendant was consciously aware that his conduct was practically certain to result in death or great bodily harm.

Some significance may also attach to defendant's claim that when he came to his senses and realized that Latyonia was not moving he immediately ascertained that she had no pulse. He then attempted to perform mouth-to-mouth resuscitation; however, his efforts were unavailing. Although defendant's attempt to revive Latyonia was laudable, it also manifested an awareness

24

that the natural tendency of strangling another human being for three to six minutes is to destroy that person's life.

Here, it is undisputed that defendant knowingly placed his hands on Latyonia's neck and exerted sufficient force to first render her unconscious and eventually dead. Clearly, the requisite mental state of knowledge could be inferred from the very nature of defendant's voluntary acts. After viewing the evidence in a light most favorable to the State, a rational trier of fact could find the essential elements of first degree murder beyond a reasonable doubt.

Alternatively, defendant maintains that even assuming the evidence is taken in a light most favorable to the prosecution he was not proven guilty of first degree murder but, rather, what he terms the lesser-included offense of second degree murder. Initially, we must observe the defendant's conceptual analysis conflicts with our supreme court's holding in *People v. Jeffries*, 164 Ill. 2d 104, 646 N.E.2d 587 (1995), that second degree murder is not a lesser-included offense of first degree murder but rather, a lesser-mitigated offense of the greater crime. *Jeffries*, 164 Ill. 2d at 122, 646 N.E.2d at 595; see *People v. Newbern*, 219 Ill. App. 3d 333, 353, 579 N.E.2d 583, 596 (1991) (it is a lesser offense because its penalties upon conviction are lesser and it is a mitigated offense because it is first degree murder plus proof that a mitigating factor is present).

Notably, the *Jeffries* court's rejection of the lesser included analysis finds support in the language of the second degree murder statute. Section 9-2(a) of the Criminal Code of 1961 provides:

"A person commits the offense of second degree murder when he commits the

25

offense of first degree murder as defined in \*\*\* Section 9-1 of this Code and \*\*\*

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed \*\*\*[.]" 720 ILCS 5/9-2(a)(1)(West 2004).[1]

We find the *Jeffries* court's observation particularly relevant given the alternative theories of culpability proffered by the defense. Although the predecessor statute of voluntary manslaughter was indeed considered to be a lesser-included offense of murder (*People v. Fausz*, 95 Ill. 2d 535, 539, 449 N.E.2d 78, 80 (1983)), *Jeffries* leaves no doubt that second degree murder actually requires additional proof of a mitigating element, either passion-provocation or imperfect self-defense. *Jeffries*, 164 Ill. 2d at 121-22, 646 N.E.2d at 595. See also J. Haddad, *Allocation of Burdens in Murder-Voluntary Manslaughter Cases: An Affirmative Defense Approach*, 59 Chi.-Kent L. Rev. 23, 27 (1982). Both the statute as well as the pertinent pattern instructions mandate that the trier of fact must first find the evidence sufficient to prove the offense of first degree murder before considering whether the defendant marshaled adequate proof

---

[1] Although second degree murder replaced voluntary manslaughter July 1, 1987, the elements are essentially identical except for provisions addressing the burden of proof and structuring the order of jury deliberations. The Committee Comments (720 ILCS Ann. 5/9-2, Committee Comments-1961, at 11 (Smith-Hurd 2002)) reflect that historically voluntary manslaughter was essentially a legal compromise between murder and exoneration, differentiating its culpability from the state of mind involved in murder as Blackstone recognized that "the law pays that regard to human fraility, as not to put a hasty and deliberate act upon the same footing with regard to guilt" (W. Blackstone, *Commentaries* 191 (1769)).

26

of either mitigating factor. See 720 ILCS 5/9-2(c) (West 2002); and Illinois Pattern Jury Instructions, Criminal, Nos. 7.04, 7.06 (4th ed. 2000).

Although we recognize that defendants may legitimately plead alternative theories of defense or mitigation, given the context of the evidence *sub judice* we perceive a degree of incongruity to defendant's argument. In asserting his involuntary manslaughter claim, defendant denies that his acts were accompanied by the requisite intentional or knowing mental state required for first degree murder. Now, in defendant's alternative argument, by necessity he is essentially conceding that the State has proved intentional or knowing murder beyond a reasonable doubt in order to raise the presence of mitigating factors. Having taken note of this apparent contradiction we now consider the merits of defendant's argument.

Defendant submits that at the time he choked Latyonia to death he was filled with passion and anger and was incapable of reflection. Yet, passion on behalf of a defendant, no matter how violent, will not relieve the individual of culpability for first degree murder unless it is engendered by provocation that the law recognizes as reasonable and adequate. *People v. Garcia*, 165 Ill. 2d 409, 429, 651 N.E.2d 100, 110 (1995); *People v. Austin*, 133 Ill. 2d 118, 125, 549 N.E.2d 331, 334 (1989). Moreover, to mitigate first degree murder the law requires serious provocation, or "conduct sufficient to excite intense passion in a reasonable person." 720 ILCS 5/9-2(b)(West 2002).[2] The only categories of serious provocation that have been recognized in Illinois are

---

[2] Because the statute defining second-degree murder was specifically intended to retain all substantive law previously applicable to voluntary manslaughter, our reliance on voluntary manslaughter cases is appropriate. See *People v. Timberson*, 213 Ill. App. 3d 1037, 1043, 573

substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. *People v. Chevalier*, 131 Ill. 2d 66, 71, 544 N.E.2d 942, 944 (1989); *Fausz*, 95 Ill. 2d at 539, 449 N.E.2d at 80.

The category of severe provocation relied upon by defendant in the case at bar is "mutual quarrel or combat." Mutual combat was defined by the court in *People v. Neal*, as follows:

"Mutual combat is a fight or struggle which both parties enter willingly or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms and death results from the combat." *People v. Neal*, 112 Ill. App. 3d 964, 967, 446 N.E.2d 270, 274 (1983), citing *People v. Matthews*, 21 Ill. App. 3d 249, 253, 314 N.E.2d 15, 18 (1974).

However, the trial court could well discern from defendant's videotaped statement that defendant was not involved in mutual combat with Latyonia. On the contrary, as defendant offered, he simply was attempting to "contain her by grabbing her hands." Although Latyonia's acts may well have been provocative, as in *People v. Jefferson*, 257 Ill. App. 3d 258, 266, 628 N.E.2d 925, 931 (1993), there simply is no evidence suggesting that the defendant and the victim entered the altercation willingly, nor did they mutually fight upon equal terms.

Moreover, here, as in *People v. Ford*, 163 Ill. App. 3d 497, 503, 516 N.E.2d 766, 770 (1987), neither defendant's actions nor his words reflected any of the emotions, such in as rage, anger, resentment or terror sufficient to establish provocation. Even assuming that Latyonia's attack might constitute provocation, to establish mutual combat the provocation must be

_____

N.E.2d 374, 377 (1991).

proportionate to the manner in which the accused retaliated. *Austin*, 133 Ill. 2d at 126-27, 549 N.E.2d at 335. Where a defendant on slight provocation attacks a victim with violence that is out of proportion to the provocation, the mutual combat aspect of provocation simply does not apply. *People v. Castiglione*, 150 Ill. App. 3d 459, 468, 501 N.E.2d 923, 930 (1986).

We find *People v. Stanley*, 146 Ill. App. 3d 912, 497 N.E.2d 496 (1986), instructive in determining whether Latyonia's conduct reached the requisite level of "serious provocation." In *Stanley*, the defendant acknowledged that he was arguing and fighting with his 15-year-old friend as the two walked down the street. As she complained about the taste of a red pill or "robbin's egg" he had given her to get high, the defendant, who was 16 years old, struck his companion and she returned the blows. As the fight escalated, they grabbed each other's crotch and she hit defendant in the face. Defendant related that " '[H]e was angry *** and held her with a choke hold around her neck.' " *Stanley*, 146 Ill. App. 3d at 920, 497 N.E.2d at 502. She fought back by grabbing defendant's arms and pulling his hair. They continued to struggle, and after he stopped choking the victim, she became limp. On appeal, defendant's efforts to reduce his murder conviction to voluntary manslaughter by reason of sudden and intense passion proved unavailing. As the *Stanley* court noted:

> "In the present case, we do not believe that the scuffling and fighting of two teenagers
> as they walked down the street constitutes sufficient provocation to justify a reduction
> to voluntary manslaughter, particularly in light of the fact that defendant said he
> continued to choke her despite her struggling and gasping for air until she went limp
> and could not be revived." *Stanley*, 146 Ill. App. 3d at 920, 497 N.E.2d at 502.

29

An identical result obtained in *People v. Miller*, 96 Ill. App. 3d 212, 215, 421 N.E.2d 406, 409 (1981), where the Third District upheld the trial court's finding that the words shouted between the parties, coupled with the limited degree of shoving and pushing, did not amount to the type of mutual combat needed to constitute sufficient provocation. Similarly, in *People v. Toth*, 106 Ill. App. 3d 27, 32, 435 N.E.2d 748, 752 (1982), the court rejected defendant's argument that the victim's acts in attempting to seduce him, hitting him with a paintbrush and brandishing a steak knife constituted sufficient provocation to warrant reduction of a murder charge to voluntary manslaughter.

In the instant case, the defense maintains that the offense described by defendant and proven by the State's evidence was second degree murder. Defendant posits that there was nothing to refute evidence showing that defendant acted under a sudden, intense passion engendered by sufficient provocation when he choked Latyonia to death. The defense boldly claims that defendant's statement was the only evidence to explain the circumstances leading to Latyonia's death and there was no basis to discredit it, as it was entirely plausible, unimpeached and consistent with the physical evidence. We disagree.

Defendant's argument overlooks the fundamental principal that the trier of fact, be it judge or jury, is not obligated to accept a defendant's exculpatory claim. *People v. Gilliam*, 172 Ill. 2d 484, 515-16, 670 N.E.2d 606, 621 (1996); *People v. Adams*, 308 Ill. App. 3d 995, 1007-08, 721 N.E.2d 1182, 1191 (1999). Determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. *People v. McLaurin*, 184 Ill. 2d 58, 79-80, 703 N.E.2d 11, 21 (1998).

30

Our review of several salient factors warrant rejection of the defendant's claim of mutual combat, and instead those factors offer support for the trial court's finding that defendant committed first degree murder. First, notwithstanding the defense claim of a violent struggle, defendant did not suffer any significant wounds nor was there any bruising on his body. In his statement, defendant asserted that Latyonia was pushing him and hitting him in the chest and face as they wrestled on the bed. Yet, here, as in *People v. McVay*, 170 Ill. App. 3d 443, 451, 524 N.E.2d 635, 640-41 (1988), none of the cuts or marks defendant exhibited to his hands required any medical attention. Second, the physical condition of the bedroom described by the evidence technician and depicted on the State's exhibits showed no hint of any fight or disturbance. Although we are mindful that defendant claimed that the fighting was confined to the bed, that assertion too is inconsistent with the evidence technician's observation that all of the toiletry items on the headboard were standing upright and undisturbed. Third, defendant maintained that the argument with Latyonia went on "for around a good hour and a half" during which Latyonia's voice was raised "in a angry manner, shouting manner." Defendant had "to scream and holler" to get his point across. Although earlier arguments had brought the children to the bedroom, curiously on this occasion they remained sleeping.

In this case, the trial judge chose to accept some of defendant's statements and reject others. As the trier of fact, it was clearly proper for the court to weigh testimony, judge credibility of witnesses and determine factual matters in the debatable set of circumstance presented. *People v. Wesley*, 65 Ill. App. 3d 25, 32, 382 N.E.2d 358, 362 (1978). We find sufficient support in the record to support the trial court's findings.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

FITZGERALD SMITH, P.J., with O'MARA FROSSARD, J., concur.