2021 IL App (1st) 180527-U

THIRD DIVISION
March 17, 2021

No. 1-18-0527

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 3239 |
| | ) | |
| LOUIS TABOR, | ) | Honorable |
| | ) | Matthew E. Coghlan |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1  *Held*:  (1) A reasonable trier of fact could have found that the State proved defendant guilty of first degree murder beyond a reasonable doubt; and (2) a new trial granted where the trial court erred in providing the definition of "bodily harm" in response to a jury question since the element required was "great bodily harm."

¶ 2  Following a jury trial, defendant Louis Tabor was convicted of first degree murder and subsequently sentenced to 60 years in prison. On appeal, defendant argues: (1) his conviction for first degree murder should be reduced to involuntary manslaughter because the evidence showed he acted recklessly by hitting the victim with a loaded gun; (2) the trial court erred in providing the jury with the definition for "bodily harm" in response to a jury question when "bodily harm"

was not an element of either first degree murder or involuntary manslaughter; and (3) his *de facto* life sentence of 60 years is unconstitutional and excessive in light of his age and other mitigating factors.

¶ 3    In February 2014, defendant was charged with first degree murder in the July 2011 shooting death of Marquis Strong. The following evidence was presented at defendant's November 2017 jury trial.

¶ 4    Lavelle Bryant testified that he was Strong's cousin. At around 11 p.m. on July 22, 2011, Bryant was with Strong and Leonard Garner (aka Kilo or Waldo) in a group of 50 to 60 other people near East 64th Street and South Eberhart Avenue. He had walked over from his aunt's house on the block. People were gathered in the middle of the block. Demetrius Ord (aka Meme) was also there, but was sitting on his porch, about three or four houses away from where Bryant and the other men were standing. Bryant stated it was a "good vibe" and everyone was "getting along." Everyone was drinking, smoking marijuana and partying, but Bryant denied that he, Strong, or Garner were drinking or smoking marijuana that day.

¶ 5    Shortly after he arrived, Bryant observed a man riding a pink and white girl's bicycle heading toward them. The man "hopped off" the bicycle, reached for his waistband, pulled out a firearm, and walked toward Garner. He did not know the man's name, but knew him from his nickname, Man Man. Bryant identified defendant in court as the man he saw on the bicycle with a firearm. Bryant was standing to the right of Garner with Strong a little behind Garner.

¶ 6    When defendant reached the men, he exchanged words with Garner. According to Bryant, defendant said, "What the F do you mean I'm drunk?" Bryant testified that he had only been at the gathering for a few minutes so he did not know what had occurred earlier. Garner responded that defendant was drunk and Garner wanted his dollar. Another man nearby

suggested that if defendant had a problem with Garner, then they should "just fight it out." Bryant did not know this man, but described him at trial as "chubby." Defendant then walked over to that man and handed him the firearm. Defendant then walked back toward Garner and both men "put their guards up as if they were going to fight."

¶ 7 Strong then said, "If you have a problem, just go ahead and fight him." Strong was standing next to Bryant at this time. After Strong said that, defendant looked back to the "chubby" man and asked, "Who is he?" Defendant then turned back to Strong and asked, "Who the f*** is he?" Bryant told Strong it was "not your fight and just walk away." Strong then started to back up. Defendant retrieved the gun from the other man and started to follow Strong with the weapon. Strong "put his guards up" for a fight. Defendant moved toward Strong with "the gun up as [if] he was going to pistol-whip him." At that time, defendant had his trigger finger on the side of the barrel. Defendant then struck Strong twice in the head with the gun. Strong was moving back as defendant was coming forward.

¶ 8 When defendant went to strike Strong with the gun a third time, Strong had backed up and defendant was not able to hit him. As defendant's hand came down, Bryant "watched [defendant's] trigger finger go into the trigger and he pulled the trigger." Bryant saw defendant pull the trigger and observed the muzzle flash from the gun. Defendant then put the gun back in his waistband, got back on the bicycle, and rode towards East 63rd Street.

¶ 9 After the gunshot, Strong started to run toward East 65th Street, but stumbled. Bryant called to him and asked if he had been shot. Strong answered that he had been shot and then he fell to the ground. Bryant went to Strong, who was breathing deeply. Bryant took Strong's phone and tried to call 911. After the police arrived, he went to his aunt's house to let them know what happened.

3

¶ 10    Later, Bryant went to the police station and spoke with the police about what happened. The police showed him two sets of photographs to identify defendant. In the first set, Bryant did not recognize anyone, but he identified defendant's photo in the second set.

¶ 11    Demetrius Ord testified that he lives on the 6400 block of South Eberhart Avenue and is known by the nickname Meme. At approximately 11:30 p.m. on July 22, 2011, Ord was standing on his porch during a memorial gathering for his sister who had passed away. The "whole street was full."

¶ 12    While he was standing on the porch, a person he knew as "Man Man" rode a "pinkish" bicycle to the location. Ord identified defendant in court as the person he knew as Man Man. Defendant was three houses down from where Ord was on his porch. Defendant was standing near Strong, Bryant, Leonard Garner, and defendant's brother. Ord knew Garner as both as "Waldo" and "Kilo." Ord heard arguing and people told him there was a dispute between defendant and Garner. Ord left his porch and went to confront the men to see if he could "squash anything or get an understanding of what was going," but there was "chaos." He saw defendant "was packing," which meant that defendant had a gun. Ord walked away to "let the big guys *** argue and talk about it" and he took about 10 or 15 steps when he heard "the pop."

¶ 13    Everyone, including Ord, then "went down" to the ground. He then saw Strong run past everyone. Ord also saw defendant with an object in his hand which he handed to his brother before defendant got on the bicycle riding north. Strong collapsed near the corner of 65th Street and everyone ran to his aid. Ord saw blood coming from Strong's mouth. An ambulance arrived 10 to 15 minutes later.

¶ 14    Ord spoke with Chicago police about the shooting. He agreed to look at a photo array and subsequently identified defendant. He admitted to having prior convictions for forgery and possession of a controlled substance with intent to deliver.

¶ 15    The parties then stipulated that if called to testify Dr. Hilary McElligot would state that she was a deputy medical examiner with the Cook County Medical Examiner's Office in July 2011. She performed the autopsy on Strong. During the autopsy, she observed "multiple vertically-oriented lacerations [on Strong's left ear] involving the skin and subcutaneous tissues, ranging from .3 to .5 inches in length." She also noted a laceration near the left corner of Strong's mouth and multiple abrasions across his upper lip. She further observed a gunshot wound in Strong's chest that traveled through his heart, lungs, and ribs. Toxicology results taken from Strong were negative for alcohol, cocaine, and heroin. In her opinion to a reasonable degree of medical certainty, the cause of death was a gunshot wound to the chest and the manner of death was homicide.

¶ 16    Detective Jeremy Morales of the Chicago police department testified that in July 2011, he and his partner, Detective David Cavazos, were assigned to investigate a shooting that occurred at approximately 11:30 p.m. on July 22, 2011 on the 6400 block of South Eberhart Avenue. When they arrived at the scene, there was a "torrential downpour" and no one was at the scene. He learned there were possible witnesses at the Third District police station. He proceeded to that location and spoke with Bryant and other witnesses. Following his conversation with Bryant, Detective Morales began looking for an individual with the nickname Man Man. He performed a computer search and located a photograph of defendant. He was present when Bryant and Ord separately viewed photo arrays and each identified defendant. Defendant was placed into custody in Ohio in January 2014.

¶ 17    Following the detective's testimony, the State rested its case. Defendant moved for a directed finding, which the trial court denied.

¶ 18    Leonard Garner testified for the defense. He admitted that he was currently in custody for an armed robbery conviction and had prior convictions for possession of cannabis and aggravated unlawful use of a weapon. Garner has two nicknames, "Kilo" and "Waldo."

¶ 19    In July 2011, he was living near 64th Street and Eberhart Avenue. On July 22, 2011, he was on the block at a gathering of more than 100 people. He was with Bryant, Strong, and a couple other people. He was close friends with Strong. He identified defendant in court as "Man Man." Garner said that he and defendant were part of the same crowd. That night, Garner was selling marijuana. At some point, defendant came up to Garner and was intoxicated. He asked Garner for marijuana, but only had $9 instead of Garner's price of $10. Garner told defendant he was "short" and that he was drunk. Eventually Garner sold marijuana to defendant for $9. Defendant then walked away.

¶ 20    Garner remained at the gathering with Strong and Bryant. Defendant later returned on a girl's bicycle. As defendant stopped, a gun fell, but defendant caught it before it hit the ground. Defendant did not point the gun at anyone. Defendant confronted Garner about calling him drunk. Someone in the crowd suggested the men fight, and they agreed to fight. Garner was "gonna square up" when Strong "got in the middle of it." Defendant then asked "who the f***" are you toward Strong because defendant did not know Strong. Defendant then went over to fight Strong, but turned around and grabbed the gun from his brother Poody. Defendant then struck Strong two or three times with the gun and then "the gun just went off."

¶ 21   After the gun fired, defendant "was stuck," "he froze," and did not move. Someone said something and defendant "snapped out of it" and got back on the bicycle and left. Garner testified that defendant never pointed the gun at Strong or anyone else.

¶ 22   Defendant testified on his own behalf. In July 2011, defendant was 20 years old. On July 22, 2011, he was with a lady friend near East 62nd Street and South Vernon Avenue. He was drinking alcohol and smoking marijuana. At some point, he went to 64th Street and Eberhart Avenue to purchase more marijuana from Garner.

¶ 23   When he arrived at the scene, he saw Garner with a couple other men. He asked to purchase marijuana, but did not have $10 to purchase it. He had "words" with Garner because he did not have enough money, but Garner later sold him the marijuana for $9. Garner then called him a drunk, which upset defendant. Defendant then went to East 63rd Street and South St. Lawrence Avenue to ask his friend for a gun. He then rode a bicycle back to 64th Street and Eberhart Avenue "to address [Garner] about him calling [defendant] drunk."

¶ 24   Defendant returned to the scene, and as he "jumped off" the bicycle, the gun he had with him fell and he caught it. Defendant then held the gun to his side and approached Garner. He asked Garner why he called defendant a drunk. Ord then approached and asked about the situation, but left. Defendant decided to have a fist fight with Garner and passed the gun to his brother. He did not attempt to shoot Garner or anyone else. As he put his fists up to fight, someone came between the men. Defendant did not know this man and asked who he was. He now knows the man was Strong. Defendant "squared up" to fight Strong, who was walking backwards toward the street. Defendant turned and retrieved the gun. He then walked up to Strong and struck him twice with the gun. He swung to strike Strong a third time and the gun went off. Defendant then stood there in shock. He denied intending to shoot Strong and did not

7

intentionally pull the trigger or put his finger on the trigger. He intended to hit Strong with the gun. Defendant denied that he fired a gunshot at Strong, but rather, the gun went off.

¶ 25    Strong then ran away. Defendant did not fire at him. Defendant did not move until someone called his name. Someone took the gun from him, but defendant did not remember who that was. Defendant then left on the bicycle and went back to 63rd Street and St. Lawrence Avenue. Before he left the scene, defendant did not know Strong had been shot, but at some point he learned that Strong had been shot and died. Defendant did not go to the police because he was scared. He admitted he had two prior convictions for armed robbery.

¶ 26    Defendant rested his case after his testimony. During the jury instruction conference, defendant asked for the jury to be instructed on the offense of involuntary manslaughter, which the trial court allowed. Following arguments, the jury began deliberations.

¶ 27    During deliberations, the jury sent out a note, which stated: "Please define 'bodily harm.' " The State suggested that the court "attempt to answer" the note, but defense counsel responded that she did not "think we should answer that. I think [we should] tell them we do not have a consistent definition for it." The court then discussed its intent to answer the jury's note. Defendant objected. The court answered the question with the following response: "the term bodily harm requires some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." Approximately 15 to 20 minutes later, the jury indicated that it had a verdict and found defendant guilty of first degree murder and that he personally discharged the firearm that proximately caused Strong's death.

¶ 28    In December 2017, defendant filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, which the trial court denied. The trial court sentenced defendant to 35 years for the first degree murder with a 25-year enhancement for personally discharging the

firearm that caused Strong's death, for an aggregate term of 60 years.

¶ 29    This appeal followed.

¶ 30    Defendant first argues that the State failed to prove him guilty of first degree murder and his conviction should be reduced to involuntary manslaughter. Specifically, he contends that the evidence failed to prove the requisite mental state for first degree murder, but instead showed that he acted recklessly when he struck Strong with the loaded gun. The State maintains that the evidence established that defendant intended to cause great bodily harm to Strong and that he knew his actions created a strong probability of death or great bodily harm.

¶ 31    When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). "Accordingly, a jury's findings concerning credibility are entitled to great weight." *Id*. The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 32    Here, defendant was charged with first degree murder under sections 9-1(a)(1) and 9-

9

1(a)(2) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/9-1(a)(1), (a)(2) (West 2010)). Thus, in order to prove defendant guilty of first degree murder, the State needed to establish that defendant killed Strong without lawful justification and he either (1) intended to kill or do great bodily harm to Strong, or knew that his actions would cause Strong's death (720 ILCS 5/9-1(a)(1) (West 2010)); or (2) knew that his actions created a strong probability of death or great bodily harm to Strong (720 ILCS 5/9-1(a)(2) (West 2010)).

¶ 33    The trial court also instructed the jury regarding the lesser included offense of involuntary manslaughter. A person "commits involuntary manslaughter when he unintentionally, but recklessly, performs an act that is likely to cause death or great bodily harm to another." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 27 (citing 720 ILCS 5/9-3(a) (West 2012)). In this case, the jury could have found defendant guilty of involuntary manslaughter if it concluded that the evidence showed defendant acted recklessly, and his actions unintentionally caused Strong's death. *Id*.

¶ 34    The primary difference between first degree murder and the lesser offense of involuntary manslaughter is the defendant's mental state. *People v. Eubanks*, 2019 IL 123525, ¶ 74. " 'Involuntary manslaughter requires a less culpable mental state than first degree murder.' " *Id*. (quoting *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882). The mental state for murder is intent or knowledge, while the mental state for involuntary manslaughter is recklessness. *People v. Jones*, 404 Ill. App. 3d 734, 742 (2010). "A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." 720 ILCS 5/4-4 (West 2010). " 'Knowledge' is a conscious awareness that one's conduct is practically certain to

10

cause a particular result." *McDonald*, 2016 IL 118882, ¶ 51(citing 720 ILCS 5/4-5 (West 2014)). "A defendant's knowledge is generally established by circumstantial evidence rather than direct proof." *Castillo*, 2018 IL App (1st) 153147, ¶ 26.

¶ 35    Conversely, a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow," and that "disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (2010). "Involuntary manslaughter requires a less culpable mental state than first degree murder and is therefore a lesser-included offense of first degree murder." *People v. Robinson*, 232 Ill. 2d 98, 105 (2008). "Whether the defendant is guilty of first degree murder or involuntary manslaughter is a question for the trier of fact." *Castillo*, 2018 IL App (1st) 153147, ¶ 28.

¶ 36    Defendant contends that the evidence supported a conviction for involuntary manslaughter, not first degree murder, because it showed that defendant acted recklessly in causing Strong's death. Defendant does not dispute that he caused Strong's death, but only contests the evidence in support of the mental state he possessed at the time of the shooting. Defendant asserts that the evidence failed to show that he acted intentionally or knowingly when he repeatedly struck Strong with a loaded gun, but rather, he acted recklessly. He maintains that the evidence showed that he did not intend to pull the trigger. However, the jury was presented with the testimony of all witnesses from the altercation and surrounding events and concluded that defendant possessed the requisite mental state in finding him guilty of first degree murder. "Determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact." *People v. Leach*, 405 Ill. App. 3d 297, 317 (2010).

¶ 37    Here, when we view the evidence at trial in the light most favorable to the State, a rational trier of fact could find, beyond a reasonable doubt, that defendant intentionally or knowingly shot and killed Strong, or that he knew his acts created a strong probability of death or great bodily harm to Strong. The evidence at trial established that defendant first arrived at the scene to purchase marijuana but was short one dollar for Garner's price. Garner called defendant "drunk," but eventually sold defendant the marijuana for the lower price. Defendant left and went to retrieve a firearm because he was angry that Garner called him drunk. He returned to the scene with the firearm to confront Garner. After a person suggested a fist fight, defendant handed the gun to his brother and prepared to fight Garner. Then Strong questioned the fight and defendant responded with anger, asking who Strong was. Defendant then retrieved the firearm and moved toward Strong. Holding the gun by the handle, defendant struck Strong twice in the head with the gun. After defendant attempted and missed a third strike, the gun fired and Strong was hit fatally in the chest.

¶ 38    We find defendant's arguments to the contrary to be unpersuasive. According to defendant, it was "reckless to handle a loaded gun while intoxicated." However, as the State points out, under Illinois law, "voluntary intoxication cannot be asserted as an affirmative defense to negate the element of intent." *People v. Himber*, 2020 IL App (1st) 162182, ¶ 55 (citing 720 ILCS 5/6-3 (West 2012)). Defendant also argues that pointing a loaded gun at another person constituted reckless behavior. However, defendant's actions showed his intentional act of retrieving the gun before approaching Strong and the jury was within its right to infer the requisite intent for first degree murder. Moreover, Bryant testified he was standing near the altercation between defendant and Strong and saw defendant's finger slide to the trigger before defendant fired the gun. Defendant describes Bryant's testimony as "incredible" and it "defies

logic," however as discussed, the credibility of witnesses is within the province of the jury. See *Leach*, 405 Ill. App. 3d at 317. In sum, the evidence was sufficient to support the jury's verdict for first degree murder. Accordingly, we reject defendant's request to have his conviction reduced to involuntary manslaughter.

¶ 39    Next, defendant contends that the trial court erred when it answered the jury's note requesting the definition of "bodily harm." Specifically, defendant asserts that the court erred in providing this definition because "bodily harm" was not an element for either first degree murder or involuntary manslaughter. Rather, both offenses required proof of "great bodily harm" and the court's response reduced the State's burden. The State responds that the court did not err in its response to the jury's note.

¶ 40    Defendant admits that while he objected before the trial court, he failed to raise this claim in his posttrial motion. However, he asks this court to review the issue under the plain error doctrine. To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Similarly, "a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *People v. Herron*, 215 Ill. 2d 167, 175 (2005). Supreme Court Rule 451(c), however, provides that " 'substantial defects' in criminal jury instructions 'are not waived by failure to make timely objections thereto if the interests of justice require.' " *Id.* (quoting  Ill. S. Ct. R. 451(c) (eff. July 1, 1997)). "Rule 451(c) is coextensive with the 'plain error' clause of Supreme Court Rule 615(a), and we construe these rules "identically." *Id.* (quoting *People v. Armstrong*, 183 Ill. 2d 130, 151 n. 3 (1998)).

¶ 41    Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *Herron*, 215 Ill. 2d at 186-87). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, the supreme court has held that the plain error rule is a narrow and limited exception to the general rules of forfeiture. *Id.*

¶ 42    Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that these alleged errors would qualify as plain error under either prong. However, "[t]he initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 43    In this case, defendant contends that the trial court erred in answering the jury's request for a definition of "bodily harm" because "bodily harm" was not an element of either first degree murder or involuntary manslaughter, but rather the higher standard of "great bodily harm" was an element for both offenses. According to defendant, by providing the definition of a lower

14

standard, the court reduced the State's burden and likely impacted the jury's verdict. The State responds that no error occurred because the court had a duty to answer the jury's question and the definition given was a correct statement of law.

¶ 44     Jury instructions are to be settled between the parties and the trial court prior to closing arguments. See 735 ILCS 5/2-1107(c) (West 2012); Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). "The function of the instructions is to convey to the jurors the correct principles of law applicable to the facts so that they can arrive at a correct conclusion according to the law and the evidence." *People v. Williams*, 181 Ill. 2d 297, 318 (1998). "It is the trial court's burden to insure the jury is given the essential instructions as to the elements of the crime charged, the presumption of innocence, and the question of burden of proof." *Id.* "Fundamental fairness requires the trial court to give correct instructions on the elements of the offense in order to insure a fair determination of the case by the jury. Failure to so instruct the jury constitutes plain error." *Id.*

¶ 45     Additionally, the jury is entitled to receive further instruction if it has a question during deliberations. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 15. "The general rule when a trial court is faced with a question from the jury is that the court has a duty to provide instruction to the jury when the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Millsap*, 189 Ill. 2d 155, 160 (2000). Nevertheless, a trial court may exercise its discretion and properly decline to answer a jury's inquiries under certain circumstances. *People v. Childs*, 159 Ill. 2d 217, 228 (1994). Those circumstances include when "the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one

15

way or another." *Id*. "[W]hen a trial court decides to answer a jury's question, it must do so correctly and 'must not misstate the law.' " *Leach*, 2011 IL App (1st) 090339, ¶ 15 (quoting *People v. Gray*, 346 Ill. App. 3d 989, 994 (2004)).

¶ 46    In determining the propriety of the trial court's response to a jury's question, we employ a two-step analysis. First, "we must determine whether the trial court should have answered the jury's question. We review the trial court's decision on this point for abuse of discretion." *Id*. ¶ 16. Second, we consider whether the trial court's response was a correct statement of law. This presents a question of law, which we review *de novo*. *Id*.

¶ 47    In the present case, the trial court instructed the jury on the elements of both first degree murder and involuntary manslaughter under the Illinois Pattern Jury Instructions (IPI). The trial court gave the following instruction for first degree murder in accordance with IPI Criminal, No. 7.01 (approved Jan. 30, 2015):

> "A person commits the offense of first degree murder when he kills an individual if in performing the acts which cause the death he intends to kill or do great bodily harm to that individual or he knows that such acts would cause death to that individual or he knows that such acts create a strong probability of death or great bodily harm to that individual."

¶ 48    The trial court also instructed the jury on the definition of involuntary manslaughter in accordance with IPI Criminal No. 7.07 (approved Jan. 30, 2015):

> "A person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm to another."

¶ 49    During deliberations, the jury asked the court: "Please define 'bodily harm.' " The court

16

then asked the attorneys for any suggestions on how to answer or if the court should answer. The prosecutor told the court she thought the court "should make an attempt to answer that." Defense counsel did not think the court should answer and should tell them "we do not have a consistent definition for it." The court then stated:

> "Generally jurors are entitled to have their questions answered. When the jury poses an explicit question on a point of law arising from the facts over which there is doubt or confusion, it is the Circuit Court's duty to provide instruction. It must do so correctly without misstating the law. However, a court may decline to answer a jury's question in certain scenarios, including where a response would serve no useful purpose or mislead the jury or where the response would likely direct the verdict one way or the other.
>
> I don't believe that this is the type of question which would direct the verdict one way or the other. They are asking for the definition of bodily harm."

¶ 50     The trial court then discussed the definition of "bodily harm" as defined in the supreme court decision *People v. Mays*, 91 Ill. 2d 251 (1982). In *Mays*, the court found that bodily harm required "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." *Id*. at 256. Here, the trial court asked the parties if they objected to this definition and defense counsel did object. The court then indicated, "My intention is to answer it as, quote, the term bodily harm requires some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." The court instructed the sheriff to bring its response to the jury at 6:30 p.m. At approximately 6:45 or 6:50 p.m., the jury indicated that it had reached a verdict. The jury thereafter found defendant guilty of first degree murder.

¶ 51    Defendant does not argue that the trial court misstated the definition of bodily harm in its answer, but that the court should not have answered the questioned the way it did because the element for both first degree murder and involuntary manslaughter was "great bodily harm," which is different than simple "bodily harm." We agree with defendant.

¶ 52    "Proof of 'great bodily harm' must demonstrate an injury 'of a greater and more serious nature than simple battery and centers on the injuries the victim actually received.' " *People v. Reed*, 2018 IL App (1st) 160609, ¶ 44 (quoting *People v. Steele*, 2014 IL App (1st) 121452, ¶ 28). Illinois courts have found that the term "great bodily harm" is not susceptible to precise legal definition. *Id.*

> " 'Because great bodily harm requires an injury of a graver and more serious character than an ordinary battery, simple logic dictates that the injury must be more severe than that set out in the *Mays* definition. The word "great" must be given effect in construing the aggravated battery statute; statutes should be interpreted so that no word or phrase is rendered superfluous or meaningless.' " *In re J.A.*, 336 Ill. App. 3d 814, 816 (2003) (quoting *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991)).

"Great bodily harm" has been found to be "more serious or grave than lacerations, bruises, or abrasions that characterize 'bodily harm.' " *Id.* at 817.

¶ 53    The jury in this case was not asked to determine whether defendant's actions caused "bodily harm," but rather whether his actions caused "great bodily harm" either intentionally, knowingly, or recklessly. Further complicating the court's response was the medical evidence presented at the trial. Dr. McElligot's testimony indicated that Strong had both lacerations and abrasions on his head. These injuries are consistent with the definition of "bodily harm," but are

not consistent with the requirement of a finding of "great bodily harm." If the jury believed it only needed to find that defendant intended to inflict injuries consistent with "bodily harm," then this testimony could have satisfied that finding. By providing the definition of "bodily harm," the jury was given inconsistent instructions where it was required to find "great bodily harm" in its verdict. The jury was left to reconcile that requirement for "great bodily harm" with the definition of the lesser term, "bodily harm."

¶ 54    "[W]hen inconsistent instructions are presented to a jury, the jury's ability to perform its function is inhibited because the jury has not been adequately apprised of the law to be applied." *People v. Alvine*, 173 Ill. 2d 273, 290 (1996). "When the instructions are confusing and create a situation in which the jurors believe they are forced to choose between conflicting elements within the instructions, as here, the instructions as a whole cannot be considered curative of the confusion." *Id.*

¶ 55    In *Alvine*, the jury found defendant guilty of both knowing murder and felony murder in relation to a burglary and possession of a stolen motor vehicle. *Id.* at 282. According to the evidence presented at trial, the defendant had broken into a car dealership and stolen a Corvette. At some point after police officers arrived, the defendant accelerated the Corvette toward the officers and one officer was struck and died from his injuries. *Id.* at 277-79. The defendant claimed self-defense for the murder charge and argued that the police were firing gunshots at him and he was fleeing from their use of excessive force. *Id.* at 283.

¶ 56    At the jury instruction conference, the parties discussed how to appropriately present the two different murder charges, knowing murder and felony murder. The State "submitted a set of instructions with the phrase 'Strong probability of bodily harm' placed as a subheading or as a parenthetical within the text of those instructions pertaining to the knowing murder charge. For

the felony murder charge, "the phrase 'Felony Murder' appeared as a subheading." Other than those additions, the instructions followed the pattern jury instructions. *Id*. at 284. During deliberations, the jury sent out two notes, the first asked if there was a time limit on deliberations and the second asked for an explanation of the phrase, "A person acts knowingly…." The trial court discussed a response with the parties, but before a response was given, the jury reached its verdict. *Id*. at 285.

¶ 57    On appeal, the defendant argued for the reversal of his conviction for knowing murder because the language added to the jury instructions was contradictory and confusing to the jury. According to the defendant, the phrase " 'Strong probability of bodily harm' " was an "incomplete statement of the mental state necessary for a finding of guilty of 'knowing' first degree murder." *Id*. at 287. The first degree murder statute at issue provided: " 'A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: *** he knows that such acts create a strong probability of death or great bodily harm to that individual or another.' " *Id*. (quoting Ill.Rev.Stat.1991, ch. 38, par. 9-1(a)(2)). The complete text with the requisite mental state was provided to the jury in the definitional and issue instructions. *Id*. Defendant contended that this conflict between the subheadings and the full instructions could have allowed the jury to convict him if they found the State had shown that his acts "created a substantial risk of death or great bodily harm, without regard to his mental state." *Id*.

¶ 58    Upon review, the supreme court concluded that "the insertion of supplemental language that contained only a partial description of a key element of the offense allowed the possibility that the jury would be confused or misled regarding the mental state necessary for a conviction" on the knowing murder count. *Id*. at 289. The *Alvine* court further observed that "although the

text of some of the instructions contained complete statements of the law, the effect of the inserted language was that the jurors were demonstrably confused on this key issue." *Id*.

¶ 59    The supreme court further concluded that "the jury was led to choose between the standard of 'knowing his action caused a substantial risk of bodily harm' and the mere existence of a 'substantial risk of bodily harm.' " *Id*. at 290. "It is clear that faced with the confusion regarding this element, the jury resolved the dilemma before reaching a verdict." *Id*. The court also found that given the jury's note and absence of any clarifying instruction, "the jury may well have decided that a strong probability of bodily harm existed, but may not have decided whether defendant knew that his acts created a strong probability of bodily harm or death." *Id*. at 290-91. Accordingly, the supreme court reversed the defendant's conviction on the knowing murder count and remanded for a new trial on that count. *Id*. at 291, 298.

¶ 60    In the present case, the jury properly received instructions on the elements of both first degree murder and involuntary manslaughter, which both require proof of "great bodily harm." However, when they requested the definition of "bodily harm" and the trial court provided that definition, this instruction not only conflicted with the required element of "great bodily harm," but was incomplete. "Bodily harm," by its definition, requires a lower burden of proof regarding the injury inflicted since "great bodily harm" requires something more serious than lacerations or abrasions. We also note that the jury reached a verdict 15 to 20 minutes after receiving the definition for "bodily harm." See *People v. Friedman*, 144 Ill. App. 3d 895, 903 (1986) ("Notably brief deliberations, however, invite an inference that the court's remarks were the primary factor in the procurement of the verdict").

¶ 61    When we consider the jury's note and the court's response followed by a quick verdict alongside the evidence which showed injuries sufficient for bodily harm, it is conceivable that

the jury found defendant acted to cause bodily harm either intentionally or knowingly when he struck Strong with the gun. However, the State was required to prove that defendant intended to kill or do great bodily harm to Strong, he knew that such acts would cause death Strong, or he knew that such acts create a strong probability of death or great bodily harm to Strong. The incomplete response from the court failed to clarify to the jury that the essential element of the offenses required the higher burden of great bodily harm. Thus, the burden of proof was lessened by the court's response. Since "bodily harm" was not an element of either offense before the jury and conflicted with the instructions of the offenses of first degree murder and involuntary manslaughter, we conclude that the trial court erred in providing the jury with the definition of "bodily harm." As in *Alvine*, we cannot assume the jurors based their verdict on a proper statement of law. See *Alvine*, 173 Ill. 2d at 290.

¶ 62     Having concluded that an error occurred, we must determine whether this error constitutes plain error. As previously observed, "[f]undamental fairness requires the trial court to give correct instructions on the elements of the offense in order to insure a fair determination of the case by the jury. Failure to so instruct the jury constitutes plain error." *Williams*, 181 Ill. 2d at 318. "An error in a jury instruction is harmless if the result of the trial would not have been different if a proper instruction had been given." *People v. Lovelace*, 251 Ill. App. 3d 607, 620 (1993). A jury instruction error "rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *People v. Hopp*, 209 Ill. 2d 1, 8 (2004).

¶ 63     We find the supreme court's decision in *People v. Ogunsola*, 87 Ill. 2d 216 (1981), to be instructive. In that case, the defendant was charged with deceptive practices under $150 for

writing a check for a car repair when he had insufficient funds to cover the payment and had intended to stop the payment. *Id*. at 218-19. The jury received an incomplete instruction listing the propositions the State was required to prove for the offense. Specifically, the instruction failed to include an essential element of the offense, intent to defraud. *Id*. at 220. The supreme court observed that it was "clear that the intent to defraud is a mental state distinct and different from the mental state of knowledge that the check will not be paid by the depository," which was also required under the statute. *Id*. at 221. The court concluded that the jury should have been instructed on the element of the intent to defraud. *Id*. at 221-22.

¶ 64    The *Ogunsola* court then considered whether the error rose to the level of plain error. "It is of the essence of a fair trial that 'the jury not be permitted to deliberate a defendant's guilt or innocence of the crime charged without being told the essential characteristics of that crime.' " *Id*. at 222 (quoting *People v. Lewis*, 112 Ill. App. 2d 1, 11 (1969)). "Jury instructions that incorrectly define the offense cause prejudice to a criminal defendant far more serious than instructions that do not include a definition of a term or that omit an instruction on a collateral issue." (Citations omitted.) *Id*. at 223. The court concluded that the error affected the fundamental fairness of the defendant's trial. *Id*. Accordingly, the supreme court affirmed the appellate court's reversal of the charge and remanded for a new trial. *Id*. at 224.

¶ 65    Additionally, we find support from this court's decision in *People v. Delgado*, 376 Ill.App.3d 307 (2007). In *Delgado*, the defendant was charged with criminal sexual assault and aggravated criminal sexual abuse. The aggravated criminal sexual abuse indictment alleged that the defendant "committed an act of sexual conduct by the transmission of semen onto [the victim's] stomach." *Id*. at 316. The alleged act, transmission of semen, is included in the Criminal Code's definition of "sexual conduct" under section 12-12(e) (720 ILCS 5/12-12(e)

23

(West 2004)), but the jury did not receive an instruction defining "sexual conduct." *Delgado*, 376 Ill.App.3d at 316. Subsequently, the jury found defendant guilty of aggravated criminal sexual abuse, but not guilty of criminal sexual assault.

¶ 66    On appeal, the defendant argued that the trial court erred in not instructing the jury as to the definition of "sexual conduct." *Id*. at 312. However, because the defendant had not preserved this issue, the court reviewed this claims under the plain error doctrine. *Id*. at 314. The reviewing court found the trial court had committed error by failing to provide an instruction defining "sexual conduct" as was charged in the indictment because the jury did not receive a definition of a critical element of the offense. *Id*. at 316-17. "[T]he error in the instruction went to a fundamental issue that prevented the jury from properly determining if the defendant was guilty of the crime charged." *Id*. at 316. Then, the court concluded the error was reversible under the first prong of the plain error doctrine in that the evidence on this issue was closely balanced. *Id*. at 318. Jury instructions will amount to reversible error if they incorrectly advise the jury as to an essential element of the crime. *Id*. at 320. The *Delgado* court further found the error satisfied the second prong of plain error because "regardless of the closeness of the evidence, the error undermined the fairness of defendant's trial and challenged the integrity of the judicial process." *Id*. at 321.

¶ 67    Under the circumstances of this case, we cannot say that the error in giving the "bodily harm" definition did not lessen the burden of proof where the State was required to prove "great bodily harm." For this reason, we conclude that the error constitutes plain error under both prongs. First, the evidence was closely balanced where the witness testimony was consistent that defendant struck Strong in the head with the firearm twice before the gun fired. The conflict was whether defendant acted intentionally or knowingly to support first degree murder or recklessly

to support involuntary manslaughter. The risk that the jury considered a lower burden on the element of "great bodily harm" is enough to have potentially tipped the scales. Second, given the conflicting instructions, we conclude that the court's instruction on bodily harm lessened the burden of proof where the jury was not fully advised as to an essential element of the crime, great bodily harm. We find this error impacted the fundamental fairness of defendant's trial. Accordingly, we reverse defendant's conviction for first degree murder and remand for a new trial.

¶ 68    Finally, we find that there is no double jeopardy impediment to a new trial. As we have already held, the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. However, in our finding, we reach no conclusion as to defendant's guilt that would be binding on retrial. *People v. Naylor*, 229 Ill. 2d 584, 610-11 (2008). Additionally, since we are remanding for a new trial, we need not reach defendant's additional argument on appeal challenging his sentence.

¶ 69    Based on the foregoing reasons, we reverse defendant's conviction and remand for a new trial.

¶ 70    Reversed and remanded.