2021 IL App (1st) 192578-U

No. 1-19-2578

Order filed October 28, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 14078 |
| | ) | |
| ALEJANDRO CARRILLO, | ) | Honorable |
| | ) | Pamela M. Leeming, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's first degree murder conviction is affirmed over his contention that the trial court did not consider all the factors that supported a finding of second degree murder or involuntary manslaughter.

¶ 2    Following a bench trial, defendant Alejandro Carrillo was found guilty of first degree murder and sentenced to 45 years' imprisonment. On appeal, Carrillo argues that the trial court did

not "appropriately" consider the factors supporting a finding of second degree murder or involuntary manslaughter. For the following reasons, we affirm.[1]

¶ 3                                        I. JURISDICTION

¶ 4      The trial court sentenced Carrillo on November 8, 2019. Thereafter, on November 19, 2019, Carrillo filed a timely notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1980, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case.

¶ 5                                        II. BACKGROUND

¶ 6      Carrillo was charged by indictment with six counts of first degree murder and one count of aggravated discharge of a firearm in the shooting death of Juan Mendez-Ramos.[2] The shooting occurred on September 3, 2018. The State proceeded on two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)) alleging that, "without lawful justification, Carrillo personally discharged a firearm that proximately caused a death when he intentionally or knowingly shot and killed Juan" (count I) or knew that such act created a strong probability of death or great bodily harm (count VI).

¶ 7      Jesus Rosales Ramos testified through an interpreter that on September 2, 2018, he attended a house party in Cicero. Shortly after midnight, he sat on the patio with his friend Juan. Neither was armed. Carrillo, whom Jesus identified in court, offered the two men beers. Earlier that evening, Jesus saw Carrillo speaking with Juan but had noticed no problems between them.

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2]We refer to Juan Mendez-Ramos and a witness, Jesus Rosales Ramos, by their first names.

Carrillo stated he would drink half a beer and that Juan could drink the other half. Juan did not respond.

¶ 8    Carrillo became upset and said, "how come you cannot drink a beer with me, but you are actually f*** my aunt." Juan responded to the effect of, "[S]he's a women [*sic*]. I'm a man. What's the problem?" Carrillo then sat on a nearby cooler while Jesus and Juan looked at their cell phones, ignoring Carrillo. A few minutes later, Carrillo approached Juan. Seven steps from Juan, Carrillo pointed a firearm at him and shot him once near his neck. Carrillo sat on the cooler and put the firearm on a speaker. Jesus gave the firearm to the owner of the house. Police officers arrived, and Jesus identified Carrillo as the shooter. Juan was hospitalized and died.

¶ 9    On cross-examination, Jesus testified that he drank 8 to 10 beers and the shooting occurred when it was dark. The parties stipulated that Jesus told police officers that Carrillo told Juan, "I don't have any prob[lem] with you going out with my aunt."

¶ 10    Carrillo's aunt, Aracelli Villagomez, testified through an interpreter that on September 2, 2018, she and her husband hosted a birthday party. At the time, Juan was dating Villagomez's sister, Fabiola. During the party, Villagomez saw Carrillo telling a "gangbanger" that he was not invited. Carrillo did not appear scared. Villagomez told Carrillo she did not want "trouble," and to tell the man that he could stay if he did not drink or "get into dirt."

¶ 11    Around midnight, while Villagomez danced near the DJ, she heard a noise and turned around. She saw Juan near balloons and assumed he had popped one. Her husband then screamed that Juan "got hit." She ran to Juan. Carrillo sat on a nearby cooler and placed a firearm atop a speaker. Jesus covered the firearm in a towel and gave it to Villagomez, who placed it in her bedroom.

¶ 12    On cross-examination, Villagomez testified that Carrillo did not mention Juan to her before the party. Carrillo showed the firearm to guests, and he told her it was unloaded. Earlier in the evening, between 9 and 9:30 p.m., Carrillo had proposed marriage to his girlfriend, and she accepted.

¶ 13    Amalia Telles testified that she attended the party and heard a gunshot shortly after midnight. She looked toward the noise and saw Carrillo, who held a firearm, and the gunshot victim. The "homeowner's wife" took the firearm inside. From approximately 30 feet, Telles saw Carrillo sit on a cooler and tell his fiancé, "mother f*** thought it was funny."

¶ 14    Salvatore Villamel testified through an interpreter that he was the DJ for the party. While playing music around midnight, Villamel heard a loud noise like a balloon exploding. He looked towards the noise and saw a person standing but did not see anything in his hands. Villamel then saw a woman approach the victim and state that he had been shot.

¶ 15    On cross-examination, Villamel testified that after hearing the loud noise, he continued playing music for three to five minutes. Carrillo was seated when police officers arrived and did not resist arrest. Villamel did not observe Carrillo say anything. On redirect examination, Villamel testified there were tables, chairs, and other people between him and Carrillo.

¶ 16    Gavin Zarbock, a Berwyn police detective and forensic investigator, testified that on September 3, 2018, he and other officers recovered a semiautomatic handgun at the residence. The magazine contained six live rounds and had malfunctioned when a casing did not "fully eject."

¶ 17    The State entered a stipulation that, if called, assistant medical examiner Dr. Eimad Zakariya would testify he performed Juan's autopsy on September 4, 2018. Juan suffered a gunshot

wound just right of his central chest. His blood alcohol concentration was 0.058. In Zakariya's opinion, Juan's cause of death was the gunshot wound and the manner of death was homicide.

¶ 18    The State entered several exhibits, including photographs of the crime scene, the projectile recovered from Juan's body, and a certified copy of the protocol prepared by Zakariya during the postmortem examination of Juan.[3]

¶ 19    Carrillo testified that on September 2, 2018, he worked as a Lyft driver, had a Firearm Owners Identification (FOID) card, and kept a firearm in a case in the trunk of his vehicle for protection. The firearm came with two identical magazines. On that date, one magazine was empty and the other contained a couple rounds, but he did not recall whether the weapon was loaded.

¶ 20    After work, Carrillo attended a party at Villagomez's house. Carrillo greeted Juan, who had catered for Carrillo's family. Carrillo complimented Juan's food and suggested Juan cater his daughter's birthday party. Earlier that day, Carrillo learned that Juan was dating Fabiola. Carrillo denied being upset about their relationship, arguing with Juan, or having "ill will" towards him. During the party, Carrillo showed his firearm to guests, including Juan and Jesus. Carrillo, Juan, and Jesus discussed their interest in firearms and shooting together.

¶ 21    Around 10 or 10:30 p.m., Carrillo proposed to his girlfriend and drank celebratory shots. Carrillo did not recall how much alcohol he consumed, but he planned to ask Villagomez if he could sleep over because he "had too many drinks." Around 11 or 11:30 p.m., Carrillo asked a stranger to leave the party. The stranger "got close" and said, "you better watch your f*** back, n***." Carrillo felt threatened, retrieved his firearm from his vehicle, and put it in his waistband.

---

[3]The record on appeal does not include the trial exhibits.

¶ 22   Later that evening, Fabiola expressed that she wanted Juan to stay at the party, so Carrillo offered Juan and his friend a beer. Carrillo was "not sure" why he removed his firearm from his waistband. He did not know whether the firearm was loaded, did not intend to shoot or kill Juan, and did not know what happened to the firearm afterwards. Carrillo's memory following the discharge of the firearm was "fuzzy," but he recalled being in "shock," "felt like [he] couldn't move," and he "couldn't believe what was happening."

¶ 23   On cross-examination, Carrillo testified that prior to purchasing the firearm, he had tried different weapons at a range. A salesperson told him the number of rounds the magazines held and showed him the grip and trigger safeties, as well as the location of the loaded chamber indicator. Carrillo received a manual, which he did not complete reading.

¶ 24   At the party, following his encounter with the stranger, Carrillo removed the magazine from his firearm and put in the one that contained a couple of rounds. Juan did not initially accept the beer Carrillo offered, so Carrillo said he would drink half and Juan could finish it. Carrillo and Juan discussed Fabiola, but Carrillo denied that Juan said, "I'm a man and she's a woman, what's the problem?" Instead, Carrillo told Juan not to "be tense" because he "didn't mind [Juan and Fabiola] dating." Afterwards, Carrillo sat on a cooler "[j]ust thinking" for a couple seconds, before he stood, pulled the firearm from his waistband, and walked towards Juan and Jesus. Carrillo denied pointing the firearm at Juan, but they were close when he pulled the trigger. Carrillo denied saying "motherf*** thought he was funny."

¶ 25   Carrillo agreed that in order to discharge the firearm, he had to apply pressure on the grip and trigger safeties. He also agreed that when there is a bullet in the chamber the indicator tilts up. He was unaware the cartridge casing jammed.

¶ 26    On redirect examination, Carrillo testified that he did not recall chambering a bullet after placing the loaded magazine in the firearm. Earlier that day, he checked whether a bullet was chambered, but he did not check again between the time the stranger arrived and the shooting.

¶ 27    Carrillo's aunt, Yecenia Guerrero, testified that at some point during the party, she saw Carrillo talk to her husband about an engagement ring. Then, Carrillo retrieved a firearm from his vehicle and showed it to Guerrero's husband. She did not see what Carrillo did with the firearm, and left the party around 10 p.m. On cross-examination, Guerrero testified that she gave a recorded statement to police on September 3, 2018, wherein she denied seeing Carrillo armed.

¶ 28    Carrillo introduced an Electronically Recorded Interview (ERI), which the parties stipulated depicted him at the Cicero Police Department on September 3, 2018.[4]

¶ 29    During closing argument, defense counsel posited that the ERI video showed Carrillo intoxicated and urinating on himself, and that Juan's death resulted from a "deadly mix of alcohol, [a] firearm and carelessness for safety."

¶ 30    The trial court found Carrillo guilty of first degree murder, merging count VI into count I. The court noted the murder was not premeditated, but rather, Carrillo retrieved and loaded a firearm after confronting an uninvited guest. When Carrillo did not like how Juan spoke to him, Carrillo pointed and fired the weapon at Juan. The court continued:

---

[4]The video, like the other exhibits, is not included in the record on appeal. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (an appellant has the burden to present a sufficient record on appeal, and "[a]ny doubts which may arise from the incompleteness of the record will be resolved against the appellant").

"[Carrillo] says he does not know how the gun accidently discharged. I heard no evidence that if you hold this gun *** a certain way, that it is prone to accidentally discharge. I heard no such evidence that the gun misfired.

What I did hear is that [Carrillo] is not a novice with a gun. [Carrillo] knows about guns. He goes to the range for shooting practice. [Carrillo] has a FOID card. [Carrillo] knows about gun safety. [Carrillo] knows about trigger safety, that one would have to apply pressure on the gun to pull the trigger."

¶ 31     Carrillo filed a motion for a new trial or "a reduction in the degree of the offense to the included offense of involuntary manslaughter," which the court denied. In so holding, the court explained that the facts supported neither "voluntary manslaughter" nor "involuntary manslaughter," and voluntary intoxication was not an available defense. Following a hearing, the court imposed a sentence of 45 years' imprisonment, which included a mandatory firearm enhancement.

¶ 32                                          III. ANALYSIS

¶ 33     On appeal, Carrillo argues the trial court did not appropriately consider all the factors that would mitigate his offense to second degree murder or involuntary manslaughter.[5] Carrillo concedes that Juan "did not provoke" him, but maintains he acted under a sudden and intense passion and had no prior intention to kill Juan, "thus rendering this a negligent and accidental death."

---

[5]When referencing second degree murder, Carrillo also uses the term "voluntary manslaughter." However, the Illinois legislature "abolished the offense of voluntary manslaughter, and substituted for it the offense of second degree murder." *People v. Jeffries*, 164 Ill. 2d 104, 111 (1995).

¶ 34 Initially, the State posits that Carrillo did not raise second degree murder at trial, and therefore, cannot argue the theory on appeal. However, where the trial court stated it considered a theory of "voluntary manslaughter," we decline to find forfeiture. See, *e.g.*, *People v. Walton*, 378 Ill. App. 3d 580, 588 (2007) (in a bench trial for first degree murder, the trial court may consider second degree murder *sua sponte*).

¶ 35 Carrillo asserts the standard of review is *de novo*. On a challenge to the sufficiency of the evidence, however, a reviewing court will not retry the defendant, nor will it substitute its judgment for that of the trier of fact. *People v. McLaurin*, 2020 IL 124563, ¶ 22. Instead, when a defendant challenges the sufficiency of the evidence supporting the trial court's finding of guilt, the relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences therefrom. *Id.* We will not set aside a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates reasonable doubt of guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 36 Relevant here, a person commits first degree murder when he kills an individual, without lawful justification, while intending to kill or do great bodily harm to that individual or another. 720 ILCS 5/9-1(a)(1) (West 2018). In turn, a person commits second degree murder when he commits first degree murder and either (1) acts under a sudden and intense passion resulting from serious provocation by the individual killed, or (2) has an unreasonable belief that the circumstances are such that, if they existed, would justify or exonerate the killing. 720 ILCS 5/9-

2(a)(1), (2) (West 2018). The first prong, serious provocation, includes substantial injury or assault, illegal arrest, adultery with the offender's spouse, and mutual combat. See *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). The second prong, imperfect self-defense, applies when the defendant believed he acted in self-defense, but that belief was objectively unreasonable. *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995).

¶ 37    The defendant must prove either mitigating factor by a preponderance of the evidence before he can be found guilty of second degree murder. 720 ILCS 5/9-2(c) (West 2018). Still, the State retains the burden to prove, beyond a reasonable doubt, each element of first degree murder and, when appropriately raised, the absence of circumstances that would justify the killing. *Id.*

¶ 38    Viewing the evidence in a light most favorable to the State, a rational trier of fact could find, beyond a reasonable doubt, that Carrillo intended to kill or do great bodily harm to Juan. Carrillo approached Juan and commented on Juan's relationship with Carrillo's aunt. Carrillo then sat for a few minutes, drew a loaded firearm, and shot Juan in the chest. Immediately afterwards, Carrillo said, "mother f*** thought it was funny." Carrillo testified on cross-examination that he put a loaded magazine in his firearm, and knew how to check whether it was loaded and how to fire. Carrillo's intent to kill can be inferred from the act of discharging a loaded firearm towards Juan's chest from a few steps away, and from Carrillo's subsequent comments. See *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (intent to kill can be inferred from discharging a firearm at another because the natural tendency of that act is to destroy another's life, and from "words and conduct after the shooting").

¶ 39    Moreover, Carrillo failed to establish by a preponderance of the evidence either of the two mitigating factors necessary to reduce his offense to second degree murder. Carrillo denied being

upset with Juan prior to the shooting, asserted that he did not argue with or have ill will towards Juan, and testified he was unsure why he removed his firearm from his waistband. Carrillo concedes on appeal that Juan "did not provoke" him. See *Garcia*, 165 Ill. 2d at 429 ("passion on behalf of the defendant, no matter how violent, will not relieve the defendant of culpability for first degree murder unless it is engendered by provocation which the law recognizes as reasonable"). Therefore, Carrillo did not show by a preponderance of the evidence that he acted under a sudden and intense passion resulting from serious provocation, or that he had an unreasonable belief in self-defense. See 720 ILCS 5/9-2(a)(1), (2) (West 2018).

¶ 40    Still, Carrillo asserts that we should reduce his conviction to second degree murder because he was intoxicated when he shot Juan. Illinois, however, does not recognize voluntary intoxication as a defense. 720 ILCS 5/6-3 (West 2018) ("A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."); *People v. Jackson*, 362 Ill. App. 3d 1196, 1201 (2006). Further, in arguing the trial court failed to consider mitigating evidence in finding him guilty of first degree murder, Carrillo incorrectly cites factors relevant to imposing the death penalty (720 ILCS 5/9-1(c) (West 2018)) or minimizing imprisonment (730 ILCS 5/5-5-3.1 (West 2018)). He adds that he had no criminal history, his conduct resulted from circumstances unlikely to recur, and he is unlikely to reoffend. Because these sentencing factors are not relevant for determining Carrillo's guilt, his argument lacks merit.

¶ 41    Carrillo also argues that he should have been convicted of the lesser-included offense of involuntary manslaughter because he testified that he did not intend to kill Juan. In so arguing,

Carrillo reiterates that he handled the firearm despite being intoxicated, and it was "plausible" that the firearm accidentally discharged as he showed it to Juan.

¶ 42    A defendant's mental state differentiates first degree murder from involuntary manslaughter. *People v. McDonald*, 2016 IL 118882, ¶ 51. A person who unintentionally kills an individual commits involuntary manslaughter if his acts, whether lawful or unlawful, are likely to cause death or great bodily harm and he performs them recklessly. 720 ILCS 5/9-3(a) (West 2018). Thus, "[i]nvoluntary manslaughter requires a less culpable mental state [*i.e.*, recklessness] than first degree murder" (*People v. Robinson*, 232 Ill. 2d 98, 105 (2008)), which requires the defendant act intentionally or knowingly (720 ILCS 5/9-1(a)(1) (West 2018)).

¶ 43    While knowledge is a conscious awareness that one's conduct "is practically certain to cause a particular result," recklessness involves a conscious disregard of a "substantial and unjustifiable risk that circumstances exist or that a result will follow," and constitutes a "gross deviation from the standard of care that a reasonable person would exercise in the situation." *People v. Leach*, 405 Ill. App. 3d 297, 312 (2010). Whether a defendant is guilty of first degree murder or involuntary manslaughter is a factual question. See *id.*

¶ 44    "Illinois courts have consistently held that when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not merely reckless *** regardless of the defendant's assertion that he or she did not intend to kill anyone." (Internal quotation marks omitted.) *People v. Sipp*, 378 Ill. App. 3d 157, 164 (2007). In this case, where the evidence established Carrillo loaded his firearm at the party, knew that applying pressure to the grip and trigger safeties would cause his firearm to discharge, and did so mere steps from Juan while pointing the firearm at Juan's chest, we cannot disturb the trial court's finding that

Carrillo committed first degree murder, regardless of his testimony that he did so without the intent to kill Juan. See *id.*; *Beauchamp*, 241 Ill. 2d at 8.

¶ 45                                     IV. CONCLUSION

¶ 46    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 47    Affirmed.